## M. D. CHAPPELL v. STATE.

### No. A-887.    Opinion Filed December 4, 1911.

#### (119 Pac. 139.)

1.    **TRIAL**—Instructions—Accomplices.    (a) Where the state relies upon the testimony of an accomplice to secure a conviction, the court may instruct the jury that the witness upon whose testimony the state so relies is an accomplice.

(b) Where the court submits the question to the jury as to whether or not a witness for the state is an accomplice, then the court, if requested by the defendant, should go further and instruct the jury what in law constitutes an accomplice.

2.    **NEW TRIAL**—Perjured Evidence.    Where, subsequent to a conviction, a witness who testified for the state upon the trial of the case makes an affidavit, stating that the testimony given by such witness for the state was false, and where the testimony for the state, excluding such admittedly false testimony is not conclusive as to the guilt of the defendant, a new trial should be granted.

(Syllabus by the Court.)

*Appeal from District Court, Pontotoc County; A. T. West, Judge.*

M. D. Chappell was convicted of arson, and appeals. Reversed.

In the trial of this case, the following testimony was admitted:

Testimony of Mrs. A. C. Inge, for the state:

"When I am at home, I live at Henryetta; that's where my daughter lives. Know defendant. Before July 12, 1908, I had been staying with Mr. Chappell part of the time, and with my daughter part of the time, and I think we were at McGee in

1908, I believe; I don't know. Know when the store was burned out here. I went to Henryetta in November, two or three months just before the time the store was burned. I was staying with Mr. Chappell. He was living out at Blackburn's gin, I reckon they call it. He was in the mercantile business; he had a country store. Part of the time he lived in the store, in a shedroom at the store. At the time the store was burned, he was living in a house on Mr. Davis' place, not a great ways from the store; reckon it is about 150 yards, or 200, from the store, but I don't believe it is that far. It was a log house; had been occupied by a man by the name of Moore; had only one room. We had been there about three weeks—it might have been near on to four, but I think it was about three weeks—before the store burned. I burned the store. I had never talked to anybody myself, but Mr. Chappell had talked to me about it. He told me that he had worked hard all of his life, and that he had tried to save up some money, and that he had left home when he was a boy on account of his brother younger than him. Said that he had lived with his mother and his sister and his brother younger than him. He just said that he was going to get back some of the money that he had lost in his time; that he had always worked hard, and made a good deal of money, but he didn't have none now, and he was going to get back some of it. I asked him how he was going to do it. He said he was going to burn the store; that he had it insured for $720 and some cents; and then he told me he was going to town, and that he intended to burn it Saturday or Sunday night, and he came to town on Saturday, and Friday night he told me he was going Friday night. He told me he was going to burn it Saturday night, and that he wanted to take out what goods he could out of there, and went on, until Saturday morning he told me he was going to town, and Friday night, when he was talking to me, he told me that he was going to burn it. I says: 'Well, all right; you can do it if you want to.' And he said: 'I don't want you to tell it.' I said, 'I am not in the habit of running around telling news,' is the answer I gave him. Saturday morning he said he was going to town, and I had to burn the store that night or the next night; but he said it would be better to burn it Sunday night; there would be fewer people around. I told him I would not do it; I was afraid to do it; I wouldn't jeopardize myself doing anything of that kind, and he had better let it alone. He told me I had it to do; that my life was in danger if I didn't do it. I was nervous and sick, and taken sick up until the house was burned,

and I was nervous and afraid. I never agreed to do it, but he
told me I had to do it; and I was afraid not to do it, because I
was afraid he would kill me. That is just all there was of it.
And then he come off to town, and said he would be back Sat-
urday night, and I said to him when he started, 'Mack, will you
be back?' he said, 'Yes,' but then he told me before that he
would not. I asked him if he would be back, a..d he said he
would, and then he told me that he would be at home Saturday
night, and I said, 'If you are not going to be at home, I will
go get Bonnie Sanders to stay with me.' He said. 'No, I don't
want Bonnie Sanders'—to stay by myself; he would be home.
He didn't come home that night. I stayed by myself. He just
told me that he wanted the goods moved, and I had to move
all I could, and he moved some of them there before he ever
left there—some of them to the house. He took some pants,
and he carried his trunk to the house, but there wasn't anything
in the trunk; but he carried some pants and some other things,
like shoe strings and such. I don't believe he carried any there.
He carried some shoe strings; he carried a load of pepper and a
load of coal oil—two gallon cans of coal oil—and there was a
two-gallon jug of coal oil. Then he carried some vinegar to the
house, and all of the meat there was there in the store; but then
there wasn't much of that; there wasn't much meat; there wasn't
much groceries to amount to anything. He carried some nails
and a few nails, and some horseshoe nails. I can't hardly re-
member all that he did carry there, and what he did carry; it
has been so long. John Foster and everybody in that neighbor-
hood—as near as I recollect, John Foster went to High Hill, or
some place, to church or singing, or somewheres, and he came
home, and somebody else; I don't know who it was. They came
in there after I had— Yes. I was at home Saturday night. Then
there was a man by the name of Burge, I believe; he came about
9 o'clock in the night. I never done nothing Saturday night, but
have a big hard chill; that is all I done that night. I was sick
all day Sunday, but Sunday night I carried part of the things
out of the store, and put them in the house and in his trunk.
I put some coffee in the trunk, in a new trunk that he had bought.
He had bought a new trunk, and had it taken out there about
a month or so before the burning. I carried some snuff up there
and put it away, and salmon. I carried some canned goods of
one kind and another, and I don't know what all I did carry; it
has been so long   Some of the pants I put in the trunk, and
coffee I put in the trunk, and some of the pants I put in under

the mattress on the bedsprings. Well, John Foster he come home, and I was standing in the store, and I stayed there in the store; stayed there until he turned his horse loose, and they came over there close to the store, and I stayed in the store there, where I could see into Foster's house. Moonlight; it was as light as it is now, just as bright as day almost. I reckon I must have stayed there an hour and a half, or maybe two hours, after I saw John Foster come home. I was staying there, waiting for him to get his light put out. Then I carried some more things up to the house and put them away, for I was afraid not to do it; I was afraid of him; afraid not to do it. After I got everything done, and everything taken out that I intended to take out, and I could take out, I just gathered up and went to the house, and fixed everything there just ready to go back to the store; and I went back to the store, and Mr. Chappell had split a lot of boxes, one type and another, of lighting matter, and put under the counter, and he told me to leave all of the big boxes that set up at the top of the house, to leave them all there; leave all of the bulky things, like outmeal and breakfast food as such things, leave them in there. We didn't have any flour or meat to amount to anything; he had left his stock run down, so he wouldn't lose anything to amount to anything in that line, and for me to put out the report that he would have a lot of goods and groceries and things there about Monday. I just put the report out; then I just turned in and took some matches and started a fire. He told me to start a slow fire; that I had to do it, and if I didn't do it he would settle with me for it; and told me then that he had left that kindling there, and there was oil in gallon cans under the counter, and I had better set the whole thing afire about where the scales were, and not to put any blinds or anything on the windows, and leave everything in shape there just like it was all of the time, and that somebody might pass in the night and put it out. And I found out you can't start a slow fire with coal oil and kindling; I have done found that out. I just lit a match and poured coal oil, fresh coal oil—there was already coal oil on the pieces—and I just poured fresh coal oil on it, and touched a match to it. I locked the doors; the west door was barred. I locked the door as I left. I then went home. Before I went to bed, I took a big dose of laudanum. Mr. Sanders came over Sunday, and I was sick. I told him I was sick, and made the remark that I wished people would buy their nails and tobacco on Saturday. I didn't want to have to stay in the store all day through the week and Sunday.

A young man came and wanted some candy, and I never went; I couldn't go. The next time I saw Mr. Chappell after the burning was Monday morning, when I sent after him. I sent a man named Huddleston, that lived at Mr. Herring's. He came past my house, and I told him to come on to town and round Mr. Chappell up, and tell him to come home. He came home about 10 or 11 o'clock, about 10, I reckon. He didn't come to the house until he went down and examined where the house had been burned, and stayed down there a while, and after a while he came to the house, and Mrs. Sanders came up to the house before he did. Old lady Sanders come over to my house while he was down there, and she says, 'Who is the man down there?' I believe Bonnie Sanders was there; Bonnie was there; I believe she was there; I won't say positive; I believe she was there. I never had any conversation with him at that time until after he went back; he came here to town, and he went back. After he went back, along in the afternoon, he said to me that it seemed like there was a good many things saved up. That was after he first came out there. I sent for him. He went out there, and he got his insurance back; that is, he got his invoice book. He invoiced his material·in the store. He got that book, and brought it here to town. He came back. He got that book and come to town here, and that evening he went back home. That time he stayed until the next day, and then he told me. That night I believe he ate supper at home; I don't remember. He slept at home that night. That day he spent going around collecting bills. That night he stayed at home. Tuesday we. came here to town the next day. He put a lock and key to the house before. He fixed a chain and a padlock to it. He had the key. When I came here, I went to Mr. Dismuke's. I stayed there until in the evening; we got in here in the morning. Mr. Jared— I don't know what his name is; it wasn't Joe Jared. It was a red-complected Jared. Chappell came to town in a wagon. That evening I went to Mr. Jack Brundidge's. I got there along, I reckon it was, 4 or 5 o'clock in the evening. I stayed at Dismuke's until it got late; it was very warm. When I got to Brundidge's, there was Mrs. Hendrix, Mrs. Frank Hendrix, and his wife, were all staying there, living in the house with Jack. Mrs. Lillie Brundidge was also there. Next I saw Chappell out at the reunion. He came to Jack Brundidge's. Jack Brundidge and his wife, Lillie, were there when he came. He asked me for a piece of paper; did not say what he wanted with it. I said to him, 'Mack, I haven't got any paper.' Lillie and Jack were

out on the porch. I says, 'Lillie, you come in here and get a piece of paper for Mack,' and she came and looked. As near as I can recollect, she didn't find any. He just said: 'I will get a piece of paper; I have got a piece of paper'—and he went to the table, and sat down and wrote on a paper. He took the paper; have not seen it since. He wrote on the paper, and told me that the things had been found, and said that the only thing and the only way that he knew to get out of it was to just say he did not know anything about it; that I didn't know anything about it; and that was all of the way he seen to get out of it; and says, 'The things have been found.' And then he wrote on the paper—says, 'You may be arrested; there is probability of your being arrested.' Said there was some men up in town talking about arresting me, and when he said that I just looked at him, and I said, 'Traitor,' and he turned right around and rode off, so Pete told me. He didn't say anything particular about why he wrote. I couldn't hear a common conversation in a low tone of voice to save my life. There were three rooms and two other rooms in Jack Brundidge's house. Jack and his wife were out on the porch; that was about eight or ten days after the fire. I don't say positively it was that; but it was about eight. The burning took place in Pontotoc county, Oklahoma. The trunk was left in the house. I had a great big large trunk there; don't know what became of that trunk. He only had one trunk, and I had one."

Cross-examination:

"I am 66 years old. Two of my husbands are dead, and one of them is divorced. Have been acquainted with Mr. Chappell nine or ten years, or longer. When he got mad at me, he would beat me up. That was at Sulphur, in a boarding house, where I was running a boarding house for him. It was in the dining room. Before the fire, I went out there on the 15th of March, last March. It will be two years this coming March since I went down there, and the fire was in July. He had a very fair stock of general merchandise. He made some money; don't know how much. He ordered goods every now and then. He didn't have any goods in there for two or three weeks before the fire."

Ernest Landrith, on behalf of the state:

"Live two miles west of Sulphur. I lived in Pontotoc county in July, 1908. Know where Blackburn's gin was; lived in about 150 yards of the gin. Remember the occasion of the store

being burned out there. Am acquainted with Mr. Chappell. Saw him on Saturday before the store was burned. He was there around the store part of the time, and at the house. Saw him go from the store to the house. I noticed that him and the Burgess boy, John Burgess, were carrying a trunk from the store to the house. It is a great big—it was a new trunk, and a great big one. Didn't know at the time what was in the trunk. Next saw the trunk the day that I helped bring the things up here. Me and Bud Blackburn brought the things up here to Ada that evening. Chappell was arrested the same evening that we brought the things up here. Got the things out of the little log house where Mr. Chappell lived. I was in company with the sheriff."

Testimony of Jamerson, for the state:

"I was with Mr. Shook when he went out here to the house that the defendant, Chappell, is said to have lived in. Mr. Shook had a search warrant. I saw it. Don't know what it called for."

Ernest Landrith, recalled:

"There was some coffee in this trunk, about half full of coffee. There was several coffee cups in the trunk. There was some sardines in the house. There was some pants between the matresses on the bed. Saw Mr. Chappell during the week after the fire, on Sunday evening. He came back up there to that house—him and a fellow in a buggy—and got this lady that was there, and came back to town, and I don't remember seeing them any more then. The house was locked with a chain and lock. I never noticed a lock on it; I never went out there." Cross-examination: "Found some goods after this house burned, where Mr. Chappell lived. Found them west of the house about 200 yards, out in the woods or bushes. There were just a few things out there. There was some twist tobacco and snuff. I lived there in about 50 yards of the house; I seen the house burn."

J. C. Jamerson, for the state:

"I lived in Oklahoma City. Am state agent for a fire insurance company. Was in the same business in July, 1908; represented the Palestine and Commercial Union, two companies. Had a policy on a stock of goods for M. D. Chappell out here at Blackburn's gin. We were duly notified of the fire. Came to Ada between the 20th and 25th. Saw defendant on that trip; had a conversation with him. He claimed a total loss under his policy of $700; $100 on furniture and fixtures, the $700 stock. He submitted his books and papers as evidence of claim. I asked

him if he had any saved goods. He said he didn't. I drove out to the scene of the fire, and there wasn't enough debris out there to indicate the stock of goods, to indicate a stock of goods of that size. There wasn't enough debris left after the fire to indicate the stock of goods of the size that he had claimed; in other words, it didn't stock up with his inventory. I was with Mr. Duncan when he got this affidavit. Don't know where Mr. Duncan is now. Don't know the name of the officer who went out there to execute this search warrant. I have heard since; understood it was Mr. Shook. Came to town when the Confederate reunion was going on. Found, I think, 85 pairs of pants there in the house, in the bed, between the clothing. Found quite a quantity of canned goods and some tobacco, cigars, and snuff, two or three pound pails of cottolene, and a number of other articles, and a bulk lot of coffee; think that was in the bottom of the trunk. Mr. Chappell furnished a statement to me—an inventory of what he had lost. That statement covered these articles. Mr. Chappell made claim for the same property that I found in this house. After I made this discovery, I didn't discuss the loss any further; never talked to Mr. Chappell after that with reference to his claim. He also made a claim for some furniture and fixtures that was also claimed by Mr. Foster. He said he didn't know how the fire occurred. He said he had been in Ada since the fire. He stated he was away from there the night of the fire."

John Foster, for the state:

"It is admitted that this witness owned the building that burned. Mr. Chappell and I are good friends; never had any trouble before."

Lillie Brundidge, for the state:

"I lived on Thirteenth street here in Ada. Lived on Fifteenth street in 1908. Know defendant and old lady Inge; have known her about five years. She was at my house in 1908, in the month of July. She was there during the reunion picnic. Know Mr. Chappell when I see him. Defendant was at my house several times along about the reunion. He was there the day she came up there, was the only time. The day he was there, he asked me for a piece of paper. Did not give it to him. He never got any from me. He had a little old piece of paper; it looked more like a laundry sheet to me than anything else. He and the old lady did not do anything that I saw while they were there. They were in the front room. He came in, and said he wanted to say something to grandma, and didn't care about the whole town hear-

ing it, and wanted a piece of paper. He had done that several times before that I knowed of."

Bud Taylor, for defendant:

"I lived 7 miles east of town in the summer of 1908, about a mile from Blackburn's gin. Knew the store building where Mr. Chappell had a store out there. I was in the store very frequently. I was in the store Saturday evening before it burned that night. Think I purchased something. Did not see Mr. Chappell there. Grandma Inge was tending to the store. I think I purchased some coal oil. I didn't notice any difference between the size of the stock that evening and any other time; was in there just a short time, probably 15 or 20 minutes."

Frank Williams, for defendant:

"I lived on Henry Lovelady's place in the summer of 1908. It was a mile and half east of the Blackburn gin, and about a mile and a half south. Knew where Mr. Chappell's store was. I was there every few days. I was there on Saturday evening; stopped there as I went home from town. Think I got a bottle of snuff in the store. The old lady waited on me in the store. Mr. Chappell was not there. I didn't notice any change in the stock. I wasn't in there but a few minutes; never noticed any change at all in the goods that was in there."

W. N. McClure, for defendant:

"I live eight miles south of Ada. I was a sheriff in Arkansas. Got acquainted with Mr. Chappell in 1880, in Murfreesboro, Ark. Am acquainted with his general reputation in the community where he resides for truth and morality. It has always been good. Never knew him to be in trouble in my life before." Cross-examination: "Never have seen any of the people from this Blackburn gin community; was never out in that community."

Clint Palmer, for defendant:

"I live northwest of this place about three miles and a half. Am acquainted with defendant. Heard about his store being burned. I saw him here in town on the Saturday evening, and he went out with me and took supper and we went to a speaking at Egypt on Saturday night, and Sunday morning he said he was going to Egypt. Left my house Sunday morning. Saw him again about sundown, or a little after, Sunday evening. He was resting right at my house right about sundown. There was a singing at my house Sunday night. Monday morning he said he was going to town and go home. He left my house afoot. He rode in a wagon with me on Saturday. Learned on Tuesday

morning that his store was burned, when I came to town. I have known Mr. Chappell ten years or more. The biggest part of that time I think his occupation has been school teaching. I think I am acquainted with his general reputation in the community where he resides for honesty and integrity and a law-abiding citizen. It is good. (Witness Jamerson, the insurance agent, is brought before the witness.) I think I met him right along about east of Haynes. He asked me—Pete Duncan first introduced me to him—and he asked me if he was out at my place, and I told him that he was on them particular nights, and he asked me how long I had knew him. I told him eight or nine years, quite a while. He asked me how was he for truth and veracity. I told him it was pretty good. It was pretty good before that. He said, 'That's one of the rottenest things I have run up against.' He says, 'We have got plenty of money, and we will put him where he belongs.' "

J. R. Floyd, for defendant:

"I live about five miles northwest of here. I am township trustee. As trustee, it is among my duties to assess property in the township in which I live. I performed that duty in 1908. I visited Mack Chappell's place out there. Somewheres about the 1st of July I assessed his stock of goods for taxes. As well as I remember, that day we went over his invoice; took the figures from his invoice. Don't remember the date of the burning of the store. Remember the occasion when it occurred. If I am not mistaken, I think defendant was at my house on the Sunday before, on Sunday morning, if I remember right. I let him have a horse to ride up the country some place, maybe to Mr. Bailey's, on Sunday morning, and he got back with him in the afternoon somewhere. If I am not mistaken, that was the Sunday before the burning. Have known defendant some three or four years; that is, personally; I knew of him for quite a while. He was raised in an adjoining county where I was. I knew of him as a boy, but we have been away from there for quite a while. Only known him in the last three or four years. From what I know, I don't know anything to the contrary that his reputation in the community where he resides is good."

Viola Bailey, for defendant:

"I lived at Bebee in 1908. Remember of hearing of the burning of Mr. Chappell's store. I saw defendant at my home on the Sunday night of which the store is said to have been burned.

It was about 1 o'clock in the afternoon. He stayed until, I guess, between 5 and 6. He had been over there several times, about three times."

John Martin, for defendant:

"Know Mr. Chappell. Heard about the time the store was burned. I saw him Saturday and also Sunday night before the burning. Seen him Saturday evening; me and Mr. Palmer and some more parties was going over to a speaking at Egypt, and I seen him Sunday night at a singing at Palmer's. It was along late in the evening, between sundown and dark."

J. R. Floyd, recalled for defendant: (State objected to introduction of tax assessment sheet for property owned by the defendant on the 1st of July, and objection sustained.)

M. D. Chappell, on his own behalf:

"I am 39 years old. Raised in Arkansas. I was a farmer there. Lived in Arkansas about 12 years ago, 12 or 15. My business and occupation in this country has been teaching principally and working in a store. Started business down here in this store that burned up in December, 1907, and ran up until July, 1908, when I burned out. Bought John Foster out when I went into that store. Took an invoice of the goods about the 1st of June some time. I had taken insurance was the cause. I had taken out a policy; had $700 insurance. I owned the fixtures. Got receipt in full from John Foster. I have the receipt. This is an inventory that I got of my goods on June 9th, that is my handwriting. This invoice was correct at the time I made it. Didn't keep much track of it before that until I took the inventory. After this inventory, I kept the amount of goods I bought after that by entering the invoice from the time I took the inventory; after that I would put it down on the book and get the bill. I kept the bills. Suppose the bills burned. I didn't see them any more. After June 9th, I kept a record of my cash sales; was running the store on a cash system. This is the list of my cash sales. From June 9th until July 10th, it amounts to $116.43; that list is correct. [Defendant offers in evidence list, and marks it 'Exhibit A'; invoice introduced, and marked 'Exhibit B.'] I was still buying groceries along as I needed them from June 9th until July 10. Didn't have any conversation with the old lady about that store that morning. I believe I told her I would be back Sunday, some time Sunday. I came to town early in the morning, and went out with Mr. Palmer in the afternoon, and spent the night with him, and went to Mr. Floyd's the

next morning, and went on over to Mr. Bailey's, and came back to Mr. Palmer's something near sundown, and stayed all night, and left town early the next morning. It was not an unusual occurrence for me to leave on Saturday morning and return Monday. I left frequently. The condition of my trade was not very different Saturday from any other day, very little. First learned of the fire about 9 o'clock Monday morning. I got a horse from the stable, and rode out there. Did not carry any goods out of the store before I left it on Saturday morning. That new trunk was a trunk I had bought at a sale here. Bought it to put my clothes in it, and the gentleman brought it out for me, and left it at the store, and I got a boy to help me take it to the house. The boy's name was John Burgess. When I carried it up there, it was empty. That was Saturday morning before the fire Sunday night. Don't know anything about how those pants got up there in the house. I was out there in that neighborhood from Monday afternoon until Wednesday morning. Tried to get those accounts straightened up, goods that I had sold on a ticket; and Wednesday morning I came to town, and was here the balance of the time. The old lady lived out there; she stayed there. The reason why I put a lock on there was because it was in such a shape; it was just on the inside of the fence, and the floor was right on the ground. Looked like there would have to be something to keep the stock out of it; no other way to fasten it. We were both aiming to leave there, and did leave. I did not carry the goods there and put them in the bed; do not know who did it; did not tell anybody to do it. Did not have any conversation with this old lady about burning this house up before it was burned; didn't tell her anything in regard to the burning. Did not carry four gallons of oil to the house. Had something like 40 to 50 gallons of oil in the store. Didn't put any pants in this new trunk at any time. On Wednesday morning after the fire Sunday, the old lady and I left there, and came to town. About a week after that, I think, I was arrested. I stayed here in town at Dismuke's. Saw the old lady over at Mr. Blackburn's. She telephoned me two or three times from Mr. Pete Duncan's. She said she wanted some money that I owed her; that I had been owing her for four or five years; and I went over there to see her to see what it was for, and why she claimed the debt. I called for a piece of paper. I wrote on the paper. I just asked her to make out a statement to make out her account, so I would know what it was for, and when she didn't make any reply much to it I went away. I didn't stay

there but a few minutes. She did not holler, "Traitor,' at me while I was there. She claimed I borrowed the money; but I don't know when it was. I submitted my papers to Mr. Duncan, the insurance man, and also the adjuster, together; they were both together. I submitted them myself. The policy was in the papers in the inventory or ledger; don't know where the policy is. I have asked them for the policy—the agent, Pete Duncan— and I didn't get it. I didn't know of any other way to get it. Have been trying to get that policy to bring suit on it, and they wouldn't turn it over. I got the goods back; received this letter through the mail, unsigned. (Letter attached to record, and marked 'Exhibit C'; state objected to introduction of letter, and objection sustained.) Never struck the old lady in my life." (Tax receipts offered in evidence, and state objected, and objection sustained. Copy of tax receipts are attached to the record, marked "Exhibit E.")

Cross-examination:

"Have known Mrs. Inge about 10 years. She has been with me part of the time since I have known her. She first lived with me in the Choctaw Nation, in 1905, I believe. Been living with me off and on ever since, keeping house for me. Lived with her people—her children, son-in-law, and daughter—at Henryetta. She lived with my mother and brother and me at Sulphur. We had been living together off and on ever since 1905. Next met her at Oakman. It has been about 10 years ago, I suppose; met her first at Henryetta. The day I was arrested, went before Squire Nettles to make a complaint against the old lady for burning this place, because I had heard of remarks she made to the people in town. Mrs. Hendrix told me that Mrs. Morgan had told her. (Defendant introduces record to show that the case against this woman has been dismissed on yesterday.)"

George Harrison, for defendant:

"Am acquainted with defendant. Have known him about 11 years. Know his reputation for being an honest, law-abiding citizen in the community where he has resided and is known. It is good. In the last 7 years have been character witness for defendants about 15 or 20 times, as much as for the other side."

*C. A. Galbraith* and *Crawford & Bolen,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J. (after stating the facts as above). First. Upon the trial of this cause, the judge instructed the jury as follows:

"A conviction cannot be had on the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense, and the circumstances thereof. That is to say, if you believe that the witness Mrs. A. C. Inge was an accomplice, then you cannot convict the defendant upon her testimony alone, unless you find it corroborated in some material point which tends to connect the defendant with the commission of the offense."

The defendant excepted to this instruction when given, upon the ground that the court should either have instructed the jury positively that Mrs. A. C. Inge was an accomplice, and therefore defendant could not be convicted upon her testimony, unless it was corroborated by other evidence which tended to connect the defendant with the commission of the offense, or that, if the court submitted to the jury the question as to whether or not Mrs. Inge was an accomplice, then the court should have gone further, and instructed the jury as to what in law would constitute an accomplice. Defendant's special instructions numbered 3 and 6 attempted to secure instructions from the court upon these two points.

The special instruction No. 6 is as follows:

"You are instructed that the witness Mrs. A. C. Inge is what is termed in law an accomplice, and that you cannot convict the defendant upon the testimony of the witness Mrs. Inge, unless the same is corroborated by other evidence which tends to connect the defendant with the commission of the alleged burning, and convinces your minds, beyond a reasonable doubt, of the guilt of the defendant; and I further charge you that the testimony of other witnesses, proving the burning of the store building in the manner and at the time as described by the witness Mrs. Inge, is not such corroboration as will warrant a verdict of guilty."

The special instruction No. 6 is as follows:

"You are instructed that you cannot convict the defendant

upon the testimony of an accomplice—that is, a party connected in the commission of the crime—notwithstanding you ·believe all of it, and believe from it that he is guilty."

The court did not err in refusing to give requested instruction No. 3, because it went too far, and was liable to create the impression upon the minds of the jurors that they could not convict upon the testimony of Mrs. Inge, unless it was connected by other evidence, which convinced the jury, beyond a reasonable doubt, of the guilt of the defendant. This is not the law. It is only necessary to authorize a jury to convict upon the testimony of an accomplice that such testimony is corroborated by other evidence, which tends to connect the defendant with the commission of the offense. The court did not err in refusing to give the sixth instruction requested by the defendant, because it would practically have destroyed the testimony of the accomplice, although it might have been corroborated by other evidence tending to connect the appellant with the commission of the offense. While these two instructions, as requested, are erroneous, and were properly refused by the trial court, yet each of them attempted to state a correct principle of law. The court should have modified the requested instructions, and have omitted the incorrect portions thereof, and have given the portions which were correct. Under the evidence in this case the court would have been entirely justified in instructing the jury that Mrs. Inge was an accomplice, but, as the court did not do so, and submitted that question to the jury, the court should have gone further, and instructed the jury what it took to constitute an accomplice.

Second. In his motion for a new trial, appellant set up the fact that, subsequent to the rendition of the verdict in this case, Mrs. A. C. Inge, the witness on whose testimony he had been convicted, had voluntarily and of her own free will and accord made a sworn statement that she had testified falsely at the trial of said cause, and that the defendant was entirely innocent of the offense charged against him, and of which he had been convicted. He attached to this motion the following affidavit of said witness Mrs. Inge:

"Henryetta, Okla., March 5, 1910. I make the following statement of my own accord for my conscience has not let me rest one moment since I testified against M. D. Chapel of Ada, Okla. I now raise my hand towards high heaven and solemnly swear that he is innocent of the crime as he is of the murder of President Garfield. He did not know that his store would be burned when he left home. Rich Sanders and myself entered into a conspiracy to rob the store and then burn it, so on Sat. night his girl Bonnie Sanders stayed all night with me. Sunday night Mr. Sanders said he would keep her at home, she might tell something, so Mr. Sanders and I went to work Sunday night to take the goods out of the store; we put them in the bushes west of the store but after Mr. Chapel and I went to Ada Mr. Sanders and I got uneasy, and Mr. Sanders put them in the little cabin where the sheriff found them. I gave Mr. Sanders a key to the house before I left to go to Ada as that was the agreement to put them in the house where Chapel lived, if we got uneasy for we knew that would shift the suspicion from us to Chapel because he had insured on the goods. Mr. Sanders said after the arrest was made that he would run away. I came to Chapel's store to work against his will, he never did want me to stay around him when he was in the mercantile business, but I went for I knew his disposition was such that he would not say a word and because he never did mistreat me in any way, he did not like me, and he did not want me to stay with him at all, he never did want me around him but I took advantage of his kindness and easy disposition and stayed with him anyhow. I received through the mail fifty dollars in bills the only things that was in the letter was this give old Chapel the devil when you get on the witness stand its the only way out don't make any difference whether he is guilty or not, it keeps you out of the pen so take fifty and it will save us six hundred and fifty. Peat Duncan told me he did not intend to let the company pay Chapel's policy for he had worked a trick on him and got the policy in his possession he also said that he offered to see that he got the money all right if he would bring the books up to his office that he would have fixed it so they would pay it, but Chapel got offended because I made the proposition so I hope he will go to the pen. I make this statement of my own accord voluntarily and without fear or influence of any person, but that an innocent man might not be wrongfully punished for a crime he did not commit. Mrs. A. C. Inge.

"Subscribed and sworn to before me this 17th day of May, 1910.   Hallie Whitaker, Notary Public.   [Seal.]"

This affidavit is not in any manner assailed by the state. The contention of the Attorney General in his argument was that under the facts and circumstances in this case the jury would have been impelled by duty to return a verdict of guilty against appellant, although the evidence of Mrs. Inge had been excluded; and, further, that it would be a dangerous rule to hold that where a witness had testified for the state that he could be permitted subsequently to file an affidavit that his or her testimony, given on the trial in chief, was false, and that such a rule would place a premium upon perjury and be an incentive for wholesale bribery of witnesses.   Cases might arise in which the argument of the Attorney General might have great force; but in the case at bar a number of reputable witnesses testified on the trial that appellant had always borne the reputation of being an honest and law-abiding citizen.   This evidence was not in any manner questioned by any testimony of the state, except the testimony of Mrs. Inge, and testimony as to some facts which, with the testimony of Mrs. Inge excluded, would not be conclusive as to the guilt of the appellant.   Under these circumstances, we think that it would be a perversion of justice to allow a citizen, of previous irreproachable character, to be sent to the penitentiary upon the testimony of a self-confessed perjurer.   It should never be forgotten that the supreme purpose of the law is to secure the enforcement of justice.   We think that the proper way to protect the state against perjury in such cases is to prosecute the party who commits it.   In fact, if there were more prosecutions for perjury instituted in the courts of the state of Oklahoma, it would be much better for the administration of justice.   A witness has no more right to commit perjury in the prosecution of a case than in the defense of a case.   A false statement, sworn to for the prosecution, is just as much perjury, and should be just as vigorously prosecuted, as though it was sworn for the defense.   In view of the evidence in this case, and the self-confessed perjury of the main witness of the

state, we think that a new trial should be granted upon both of the grounds herein discussed.

The judgment of the lower court is therefore reversed, and the cause is remanded for a new trial.

ARMSTRONG and DOYLE, JJ., concur.