# F. L. THOMPSON v. STATE.

No. A-1591. Opinion Filed June 7, 1913.

(132 Pac. 695.)

1. **TRIAL—Evidence—Corroboration of Accomplices—Direction of Verdict.** A verdict of guilty upon the uncorroborated testimony of an accomplice is contrary to law and to the evidence; for this reason the defendant's motion to direct a verdict of not guilty should have been sustained.

2. **INTOXICATING LIQUORS—Prosecution—Evidence—Reputation of Premises.** Upon a trial under an information charging that the defendant did have the possession of intoxicating liquors with the intention of violating provisions of the prohibitory law, evidence of the general reputation of his home or barn is incompetent to prove the charge.

(Syllabus by the Court.)

*Appeal from Pottawatomie County Court;*
*Ross F. Lockridge, Judge.*

F. L. Thompson was convicted of violating the prohibitory law, and appeals. Reversed.

*P. O. Cassidy* and *E. D. Reasor,* for plaintiff in error.
*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen. (*Monroe Osborn,* of counsel), for the State.

DOYLE, J. The plaintiff in error was convicted upon an information filed in the county court of Pottawatomie county on the 15th day of August, 1911, which charged that:

"F. L. Thompson did on or about the 12th day of August, 1911, unlawfully have the possession of whisky and alcohol with the intent then and there unlawfully to sell the same."

October 28, 1911, he was sentenced in accordance with the verdict of the jury to be confined in the county jail for 30 days and to pay a fine of $200. To reverse the judgment the defendant perfected an appeal by filing in this court January 20, 1912, a petition in error with case-made.

The assignments of error are in effect as follows: First. That the court erred in overruling the defendant's motion to strike the information from the files for the reason that said information was entitled in the superior court, and the further reason that said information gave the "superior court" to know and be informed that the defendant had committed the crime of unlawfully having in his possession spirituous liquors with intent to sell, etc., and in permitting the county attorney to amend said information by inserting "county" wherein the word "superior" occurred in said information; and that the court erred in permitting the county attorney to indorse upon the information names of four witnesses, after the jury had been impaneled and sworn to try the case, over the defendant's objection; and that the court erred in admitting incompetent, irrelevant, and hearsay evidence on the part of the state, and in excluding relevant and competent evidence offered by the defendant; and that the court erred in refusing to instruct the jury not to consider improper remarks of the county attorney in addressing the jury; and that the verdict is contrary to law and to the evidence.

From an examination of the record, the conclusion of the court is that the judgment in this case cannot be permitted to stand, as it is evident that the defendant did not have a fair trial. A fair trial is a legal trial, or one conducted in all material things in substantial conformity to the law. An unfair trial, especially in a criminal case, is a reproach on the administration of public justice. And in this case there seems to have been a careless disregard of the legal rights of the defendant, not only in the manner in which the information was drawn and filed and the names of the witnesses indorsed thereon, but the trial judge permitted to be introduced incompetent and hearsay testimony for the evident purpose of attempting to corroborate the testimony of an accomplice, and allowed continuous departures from the law by the prosecuting attorney, although he should have known that it was his duty

to prevent them, even on his own motion, without suggestion from the defendant's counsel.

The only testimony which in any manner tends to support the verdict was that of the complaining witness, Earl James, who subscribed his name to the information by making his mark. This witness testified that he lived at Sasakwa, but in August went to Maud, and while there was arrested and convicted of selling whisky; that he worked for the defendant in Seminole county in July, hauling ties; that on August 8th he went with the defendant to Spaulding, in Hughes county, and there the defendant received from the express office a case of whisky and a jug of alcohol and they took it to the defendant's logging camp, and there they put the liquor in Mrs. Callie Lewis' tent, under the bed, and a few days later they took the liquor from under the bed and put it into a buggy and brought it to Maud and placed it in the defendant's barn; and that witness took it to Truesdell's wagon yard and sold it for the defendant on a percentage; and that the defendant promised to take care of him if he was found guilty of selling the liquor, and told him he would pay his fine and make his bond, if necessary. He admitted that he told several persons that he had been engaged in selling liquor at Bromide, but that he did not tell the truth; that he also worked with Bill English making posts for the defendant.

Mrs. Dickson testified that she lived at Maud. She was then asked:

"Q. On or about the 12th day of August, did you know what the reputation of defendant's barn was as to being a place where whisky could be procured? (Defendant objects and asks that the witness answer the question 'Yes' or 'No.') A. I do not know whether I could answer it by saying 'Yes' or 'No,' but I have heard it was."

Mrs. Sam Hall testified she lived at Maud, and the record shows her testimony as follows:

"Q. I will ask you to state, Mrs. Hall, if you know what the general reputation of the Thompson barn in the town of

Maud was on or before August 12, 1911, as to being a place where whisky could be procured? A. I reckon it was from all appearances. Q. Do you know the reputation? A. All that I know is that I saw this boy going to and coming from Mr. Thompson's barn. Q. Which boy do you have reference to? A. Earl is his first name; I do not know his other name. (The defendant moves to strike out the answers of the witness. Motion overruled by the court, and the defendant excepts.")

Gus Jones testified that he bought a bottle of whisky from Earl James at the Truesdell's wagon yard on August 12th. He was then asked: "Q. Do you know the reputation of the Thompson barn as to being a place where whisky could be procured?" and answered, "No, sir."

Elzie Lewis was asked the same question and answered, "No, sir."

Several other witnesses were asked if they knew the general reputation of the defendant's barn as to being a place where whisky could be procured, and all answered that they did not.

Louis Eidson testified: That he was city marshal at Maud and arrested Earl James for selling whisky, and searched the defendant's barn but did not find any whisky. That the barn had the reputation of being a place where whisky could be procured.

Marshal Waldridge testified that he had lived at Maud for five years, and was convicted of selling whisky and served his sentence by working on the roads. He was then asked if he knew the general reputation of Thompson's barn and answered, "No." He was then asked if he ever saw any whisky at the barn and said, "Yes," a good while ago; that he and a fellow named Spears went down an alley to the back of the barn and Spears reached his arm under the barn and got some whisky; that the defendant Thompson was not in Maud at that time. On cross-examination he further stated that he and the complaining witness, Earl James, served sentences together, and while they were in the convict camp Earl James told him that the whisky belonged to him and Bill English, and was carried to Maud by English, but that:

if Thompson did not get him out of the trouble he was going to swear that the whisky belonged to Thompson.

The state then rested, and the defendant moved the court to direct a verdict of not guilty, which motion was overruled and exception allowed.

On behalf of the defendant Mrs. Callie Lewis, the owner and occupant of the tent referred to in James' testimony, testified that the defendant never kept any whisky or alcohol in her tent; and that she was present when the defendant and James started to Maud; and that no case, box, or jug was put in the buggy.

Roy Sanders testified that he was at the logging camp and helped James hitch to the buggy, and he did not see any whisky or alcohol in the buggy, and if there was he could have seen it; that he heard Bill English say that he had some whisky and that he was going to take it to Maud and Earl James was going to help him sell it; and that old man Thompson had been kicking about him having whisky around the camp and that if he did not stop he was going to tell that it was Thompson's whisky, and Earl James asked witness to help them sell the whisky, and said that if Thompson kicked any more about it they were going to tell it was his whisky.

Harry Thomas testified that Earl James gave him some whisky to drink in Seminole county about the 1st of August and told him he was going to Maud to a picnic and sell whisky there; that Bill English was to bring it there in James' father's buggy. He also stated that he had often bought whisky from Earl James in Seminole county.

Verge Davis testified that on August 2d at Thompson's logging camp he had a conversation with Earl James and Bill English and they told him that they had some whisky and alcohol hid across the river, and that they were going to take it to Maud to a picnic.

J. F. Hooper testified that Earl James told him about August 1st that he had been selling whisky at Bromide, and

that he was scouting from the officers, and that he sold whisky there to some of the boys on the ranch.

W. W. Doss and J. H. Handley testified that on August 8th, at the time Earl James testified that he and the defendant went to Spaulding, that the defendant was at Mr. Handley's place that day.

Grace Hale testified that she was at the defendant's home when he and Earl James drove up to the gate, and when they stopped she went out to the buggy and took out some peaches, and there was no whisky or alcohol in the buggy.

J. W. Andrews testified that he was engaged in the cattle business and rode out of a pasture across the road from the defendant's house, and, seeing the defendant and Earl James drive up, he stopped and talked with the defendant while he took a lap robe and a couple of coats out of the buggy, and there was no box or jug in the buggy; that Miss Grace Hale was standing in the dooryard.

The defendant testified in his own behalf that he was 60 years of age; that he had lived in Maud for several years; that he was engaged in the timber business for 5 or 6 years; that his camp was about 25 miles from Maud; that he never at any time received a shipment of whisky or alcohol at Spaulding; that Bill English in July was making posts for him at so much per hundred, and Earl James worked helping English; that at one time James drove a team for him a while; that his barn is built with a granary in the center and a shed on each side; that there was never any whisky in his barn that he knew of; that he never sold any whisky in his life, except that he worked a while in a drug store in the state of Alabama. On cross-examination he was asked:

"Q. You were tried there in the town of Maud by a jury on this charge? A. I suppose it was the same charge. Q. What was the outcome of that trial? A. I was convicted, but they would have convicted Jesus Christ. (The defendant moves to strike out the questions and answers with reference to any conviction at Maud for the reason that the court in which the complaint was filed had no power to render judg-

ment.　Objection overruled and exception allowed, and it is agreed that an appeal from the municipal court of Maud is now pending in this court.)"

The foregoing constitutes a fair statement of the testimony and is sufficient to indicate a few of the manifold errors committed upon the trial.

There is no evidence in the record, except that of the complaining witness, that tends to connect the defendant with the commission of the offense charged. Upon his own testimony the complaining witness is an accomplice, and a conviction cannot be sustained upon his uncorroborated testimony.

Our Procedure Criminal provides that (section 5884, Rev. Laws) :

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

In the case of *Hendrix v. State,* 8 Okla. Cr. 530, 129 Pac. 78, it is said the term "accomplice," as used in section 5884, Rev. Laws, providing that no person shall be convicted of a crime on the testimony of an accomplice without corroboration, must be construed as meaning one culpably implicated in the commission of the crime of which the defendant is accused; in other words, an associate, one who knowingly and voluntarily cooperates or aids or assists in the commission of the crime. See, also, *Head v. State, ante,* 131 Pac. 937. A verdict of guilty upon the uncorroborated testimony of an accomplice is contrary to law and to the evidence. For this reason the defendant's motion to direct a verdict of not guilty should have been sustained.

In his closing argument to the jury the prosecuting attorney made the following remark: "Why didn't the defendant bring good reputable witnesses from Maud to prove his good reputation?" The court refused the defendant's request to instruct the jury not to consider the same. It would seem that

the prosecuting attorney labored under the delusion that, if the defendant was generally reputed to be guilty of the offense charged, that would be sufficient to sustain a conviction in the absence of rebutting evidence, and his rash remark was in accordance with his views.

The evidence of the general reputation of the defendant's barn was incompetent, and not admissible. A man cannot be condemned on what a few of his unfriendly neighbors say of him or of his home in cases like this. Such evidence is merely hearsay, and its admission was prejudicial to the defendant. It is our opinion that the verdict of guilty is contrary to the law and to the evidence.

The judgment of the county court of Pottawatomie county is reversed, and the cause remanded, with direction to dismiss.

ARMSTRONG, P. J., and FURMAN, J., concur.