WILLARD YODER et al. v. STATE.

No. A-3259—Opinion Filed May 9, 1921.

(197 Pac. 848.)

(Syllabus.)

1. **WITNESSES — Cross-Examination — Bias and Contradictory Statements.** On cross-examination of a witness for the state the defendant may show any bias or special interest the witness may have in the prosecution, as affecting his credibility, or to show that any other witness for the state has made contradictory statements concerning any material fact at issue.

2. **NEW TRIAL—Affidavit of Witness Confessing to False Testimony.** Where an affidavit of a witness is filed after the trial in support of a motion for a new trial, in which the affiant states that the testimony given by him at the trial was false and untrue; and where the record of his testimony and that of others given at the trial casts a doubt on the verity of such testimony; and where the record discloses that such testimony may have been given under duress or undue influence—affidavits of this character may be considered in deciding a motion for a new trial, along with all the other facts and circumstances in the case. But in no case should the verdict be disturbed where the question hinges entirely on an ex parte affidavit of this character.

3. **SAME—Case Overruled.** The rule announced in the case of Chappell v. State, 6 Okla. Cr. 398, 119 Pac. 139, that where a

witness who testified for the state upon a trial of a case makes
an affidavit, stating that the testimony given by such witness
for the state is false, and where the testimony for the state,
excluding such admittedly false testimony, is not conclusive of
the guilt of the defendant, a new trial should be granted, is
overruled and modified to the extent stated in this opinion.

*Appeal from District Court, Grady County;*

*Will F. Linn, Judge.*

Willard Yoder and Ollie Yoder were convicted of lar-
ceny of domestic animals, and they appeal. Reversed and
remanded.

*Bond, Melton & Melton,* for plaintiffs in error.

· *S. P. Freeling,* Atty. Gen., and *E. L. Fulton,* Asst. Atty.
Gen., for the State.

BESSEY, J. On the 2d day of April, 1917, by
information filed in the district court of Grady county,
plaintiffs in error, Willard Yoder and Ollie Yoder, herein-
after designated defendants, were charged with the larceny
of domestic animals. On the trial, ending October 17,
1917, a verdict of guilty was rendered against the defend-
ants, fixing their punishment at two years in the state
penitentiary, and judgment and sentence were rendered
accordingly. From this judgment and sentence defendants
have appealed to this court.

The subject-matter of this action, as shown by the 555
pages of record, grew out of the disputed ownership of two
red pigs, variously estimated to have weighed at different
times from 20 to 40 pounds, and each of the probable
value of from $1 to $10. Two neighbors, each
owning a large number of hogs, kept them in
adjoining pastures prior to the time this dispute arose,

and concerning the ownership of two of these pigs these neighbors have since participated in three or four bitterly contested criminal trials, in addition to a civil suit in replevin.

Unlike their owners, the pigs in controversy seem to have been of an amiable disposition, and not averse to associating with the other pigs there of like size and character. We quote from the record:

"Q. What was the action of these six pigs, one to the other, of those two towards the four that was there, when you put them in the pen together? A. When I put those pigs there in the pen they just kind of smelled one another around, and went on off to rooting like they were used to one another.

"Q. Was there any fighting between them? A. No fighting at all; no, sir."

In order to understand the issues affected by the appeal it will be necesary to state briefly the substance of the testimony disclosed in this record. During the year 1916, Walter Kilgore lived on his father's farm, five miles northeast of Chickasha, and he and the father, W. S. Kilgore, kept a large number of hogs of various size and character there in a pasture. J. M. Yoder, a brother of the defendants, then lived on an adjoining farm, where there was a hog pasture in which were kept a large number of hogs. These hog pastures were separated by a division fence, concerning the character of which, as to being hog-proof, the evidence is conflicting. It appears that both Kilgore and Jim Yoder had red brood sows, and that during the late summer and early fall each was the owner of some red suckling pigs, Mr. Kilgore kept a red Duroc boar for breeding purposes and this boar had, for a time at least, been kept in a pen on

his premises. Late in the summer Walter Kilgore went to Texas, where he remained for some weeks, leaving his hogs in charge of a hired man. There is testimony to the effect that on several occasions this boar was at large in both pastures, and feeding and ranging in fields adjoining. The testimony indicates that the two pigs in question may have been the offspring of this boar and one of Yoder's sows, or they may have been the offspring of this boar and one of Kilgore's sows.

In January, 1917, Jim Yoder bought the Kilgore farm and moved there on February 9th, the same day that Kilgore vacated the premises. John Kilgore, a cousin of Walter Kilgore, helped Walter move, and claims that after they had moved several loads there were six small red pigs there belonging to Walter, and that he tried to catch them but failed. The next day, when he returned to get them he found but four. That night there was a dance given at these premises by Jim Yoder. Jake Fischer testified that he was at these premises late in the evening before the dance, and that Ollie Yoder, one of the defendants, there stated to him that if he would help catch these pigs they would get away with them, and Jake agreed to go back after the dance and help Ollie move them. That Jake then went to the home of his brother, George Fischer, about 2 miles distant, and told his brother what he had agreed to do; and that George told him that he was then having trouble enough, and dissuaded him from going back, as he had agreed to do. That on the following morning he went back to the Yoder premises and saw Ollie again, and the latter reprimanded him for not coming back the night before, and stated that he had got away with two of the pigs without his help. That in March, about one month later, two red pigs of the kind and character in dispute were found in a pen, in

possession of Willard Yoder, the other defendant, about 14 miles distant from the original Kilgore place. That they were identified by Mr Kilgore as two of his pigs, and with the assistance of others he took possession of them while the Yoders were absent from the premises where they were found. Willard Yoder then instituted a suit in replevin to recover them from Kilgore.

J. M. Yoder testified that in the fall of 1916 he sold 48 head of mixed hogs, mostly shoats, to his brother Willard, among them three small red pigs. That when these hogs were delivered he decided he did not want to put the small pigs with the others, and so gave them to Pearl Yoder, who happened to be there at the time, and that she later took the smallest one of the three home and sold the other two to Ollie, one of the defendants here. That Ollie later took these two to his brother Willard's, where they were found by Kilgore and by him taken into possession as before stated.

There was much conflicting testimony concerning the size, appearance, weight, and ownership of these two pigs. At the first trial in district court in this larceny case the jury failed to agree; at the next trial, October 17, 1917, the jury rendered a verdict of guilty as against both defendants, fixed their punishment at two years in the penitentiary.

There was testimony tending to show that Jake Fischer was not at the Kilgore-Yoder place on the day and at the times claimed by him. It appears that at this time Jake Fischer was himself a defendant in a criminal action pending in Grady county, and that prior to the time of the dance he had been on the scout and in hiding to evade arrest. It was the theory of the defendants, and the record gives color

to the theory, that Jake Fischer was an interested witness in the instant case, and that he was endeavoring to assist Walter Kilgore and the county attorney in the prosecution of the Yoders, as far as possible, in order to secure immunity or favors in the criminal case pending against him. From the record in this case it appears in a number of places that Fischer was testifying under some unexplained influence or duress. An instance is given as follows:

"Q.  I will ask you this question: Are you or are you not afraid to testify in this case?   A.   Well, yes; I am.

"Q.   Why are you afraid to testify in this case?   Just state to the jury and the court why you are.   A.   I don't know as I am afraid of any one personally.

"Q.  What are you afraid of? A. What might come up later on.

"Q.  Come up how later on?   A.   Well, I don't know whether people would gyp me, or what they would do to me.

"Q.   I will ask you if any one—if you know whether there have been any threats made against you if you testify in this case.   A.   None direct that I know of.

"Q.   Have any threats ever been communicated to you? A.   Yes, sir.

"Q.   From whom?   A.   Well, a fellow by the name of Gilpatrick.

"Q.   And coming from whom?   A.   Well, he said it came from Yoders, but I didn't much believe that they said it.

"Q.   Well, then, tell the jury why you told me a minute ago that you were afraid to testify.   A.   Well, I said I wasn't personally afraid of any one.

"Q.   You are friendly with the Yoders, aren't you, now?   A.   Not with no one only Jim.

"Q. Jim is a brother of these— A. (interrupting) Yes, and a brother-in-law of mine.

"Q. But you are afraid to give your testimony in this case? A. Well, I will say 'Yes' on that question."

For the purpose of showing the attitude, feeling and interest of the prosecuting witness, Kilgore, and of the witness Fischer against these defendants, the defense sought to show that Kilgore and Fischer were corruptly prosecuting the case. Again quoting the record:

"Mr. Melton: Defendant offers to prove by the witness on the stand that after the preliminary examination in this case Walter Kilgore, the prosecuting witness, met this witness, and stated to this witness that he found his sow, the mother of these pigs, and that he didn't believe that the Yoder boys had anything to do with it, but that he had started in on this prosecution and wanted this witness to stay with him for the purpose of prosecuting the two defendants here.

"Mr. Simpson: To which we object as incompetent, irrelevant, and immaterial, not proper cross-examination.

"The Court: Sustained, and refuse to permit the defendants to make such proof.

"Mr. Melton: To which the defendants except."

If such facts existed and such inconsistent statements had been made, it was proper and important testimony that should have been admitted for the consideration of the jury, as affecting the credibility of both these witnesses and the weight to be given their testimony. In the case of *Cassady v. State*, 18 Okla. Cr. 568, 197 Pac. 171, it was held:

"It is permissible on cross-examination of a witness for the state, to show his malice or unfriendly attitude towards the defendant or any special interest he may have in the prosecution, as affecting his credibility, and this is so even though the subject of injury may be embarrassing or humiliating to the witness so interrogated."

If on further cross-examination the defendants could have developed from the witness Fischer that he had promised Kilgore "to stay with him" irrespective of the defendants' guilt, it was a right these defendants had that such testimony should go to the jury, and it was error to exclude such testimony. *Henry v. State*, 6 Okla. Cr. 430, 119 Pac. 278; *Gilbert v. State*, 8 Okla. Cr. 543, 128 Pac. 1100, 129 Pac. 671; 40 Cyc. 2654, 2664, notes, and cases cited.

With the possible exception of the evidence of Walter Kilgore, the only direct evidence of a probative nature connecting the defendants with the crime was circumstantial and inferential, and not inconsistent with the innocence of the defendants. So, then, if the testimony of Jake Fischer is found unworthy of belief, the jury would have had the right to eliminate the testimony of Jake Fischer altogether, and possibly the testimony of Walter Kilgore. In that event under the well-known rule applicable to the probative force to be given circumstantial evidence, that such evidence must be of so conclusive a character as to exclude to a moral certainty every other reasonable hypothesis save that of the defendant's guilt, the verdict of guilty in this case, according to that test, would not be supported by sufficient evidence.

If the defendants could have shown to the jury that Walter Kilgore had made the statement that he had since

found the sow, the mother of these pigs, and that he did not believe the Yoder boys had anything to do with it, but that he had started in with this prosecution, and wanted this witness Fischer to stay with him to the end, such testimony would have been material, as affecting the credibility of Walter Kilgore and the possible elimination of his testimony, as well as that of Jake Fischer. Eliminating the testimony of these two witnesses, the state would have had little left to rest upon.

After judgment and sentence the defendants filed their motion for a new trial. This motion was later amended, urging newly discovered evidence, to the effect that Fischer and Kilgore had made statements to others contradictory to the statements made by them at the trial. This feature of the motion for a new trial was supported by oral testimony and affidavits and in like manner resisted by affidavits and oral testimony on the part of the state. One of these affidavits was made by Fischer, in which he repudiated all the material testimony given by him at the trial. In this affidavit he stated that he was influenced to testify falsely at the trial by threats and intimidation, and under fear of a more vigorous prosecution for disposing of mortgaged property, that he in fact was not even at the Yoder premises the evening preceeding the dance, and that he had no conversation or agreement with Ollie Yoder concerning the pigs in question and knew nothing about the taking of the pigs. Later on Fischer made a counter affidavit, which was filed by the county attorney in resisting the motion for a new trial, in which Fischer repudiated the statements made in his former affidavit, and stated that his testimony as given at the trial was substantially true and correct. Under such a situation it is fair to presume that Jake Fischer would have continued to make other affidavits and counter affidavits upon request of either party.

The court, in overruling the motion for a new trial, made the following finding:

"The Court is of the opinion that the evidence is this case, excluding the evidence of J. A. (Jake) Fischer, is conclusive of the guilt of the defendants."

Under the circumstances disclosed by this record, the unimpeached evidence is far from conclusive. Excluding the testimony of Fischer, and considering the possible impeachment of Walter Kilgore, the remaining testimony was for the most part circumstantial and more or less contradictory and opinion evidence as to the identity of the two pigs. At the former trial, without excluding Jake Fischer's testimony, the jury failed to agree and on a motion for a new trial in the instant case the court should not have anticipated that another jury would without the testimony of Fischer find the defendants guilty, and especially so if this testimony would be, as it should be, submitted with an appropriate instruction on circumstantial evidence.

The affirmative finding of the court that, excluding the evidence of Fischer, the evidence remaining was conclusive of the guilt of the defendants, was doubtless predicated upon the holding of this court in the case of *Chappell v. State,* 6 Okla. Cr 398, 119 Pac. 139, wherein the court held:

"Where, subsequent to a conviction, a witness who testified for the state upon the trial of the case makes an affidavit. stating that the testimony given by such witness for the state was false, and where the testimony for the state, excluding such admittedly false testimony, is not conclusive as to the guilt of the defendant, a new trial should be granted."

We think the rule announced in the Chappell Case, *supra*, to the effect that where a witness for the state after the trial makes an affidavit stating that the testimony given by him at the trial was false, and for that reason alone a new trial may be granted, unless the remaining testimony is conclusive of the guilt of the defendant, is stating the rule too broadly, and is contrary to the weight of authority. Such an unqualified rule would place a premium upon perjury and the bribery of witnesses. Ordinarily the verdict of a jury should not be set aside because of *ex parte* affidavits made out of court.

Notwithstanding our disapproval of the broad declaration to the contrary in the Chappell Case, in certain instances, as in this case, where the record of the testimony at the trial casts a doubt on the verity of the testimony, and where the record discloses that the testimony may have been given under duress or undue influence, such affidavits may be considered in **deciding a** motion for a new trial, along with all the other facts and circumstances in the case. But we think in no case should the verdict be disturbed where the question hinges entirely on such *ex parte* affidavits. *People v. Tallmadge*, 114 Cal. 427, 46 Pac. 282; *Mann v. State*, 44 Tex. 642; *People v. McGuire*, 2 Hun (N. Y.) 269; *U. S. v. Biena*, 8 N. M. 99, 42 Pac. 70.

Considering the entire case, including the affidavits of the witness Fischer that he and others had sworn falsely, and including the charges and counter charges urged in the motion for a new trial, and including the admission of the witness on the stand that he was afraid to testify, it is our opinion that the guilt of the defendants was left too uncertain, and the character of the evidence against them

was too indefinite and unreliable, to justify the court in refusing them a new trial.

For the reasons stated in this opinion, this case is reversed and remanded.

DOYLE, P. J., and MATSON, J., concur.