### D. W. JOLLIFFEE v. STATE.

No. A-3763.   Opinion Filed May 27, 1922.
(207 Pac. 454.)

(Syllabus.)

1.   Evidence—When Witness' Testimony at Preliminary Hearing May Be Introduced—Witness Imprisoned in Another State. Before the evidence taken at a former trial or a preliminary

hearing can be introduced against the accused at the final trial it must appear that the witness is dead, insane, sick, or beyond the reach of the process of the court, and that the presence of the witness with reasonable dilligence cannot be procured.

a. Where such witness escapes from jail, and becomes a fugitive from justice, and is held in confinement to answer criminal charges in another state, in the absence of collusion it is not incumbent upon the state to make an effort to have such witness returned for final trial as a condition precedent to the introduction. of his evidence taken at a former hearing.

b. If the officers of the court by collusion or agreement are responsible for the absence of such witness, his testimony taken at a former hearing should not be permitted to be used at the final trial.

2. **Larceny—Inadmissible Evidence of Value of Cattle at Another Time and Place.** In a prosecution for the larceny of cattle, where the value of the cattle at the time and place of the theft is at issue, the purchase price of other cattle at distant places 30 days before or 30 days after the theft is inadmissible.

3. **Trial—Question for Court—Whether Witness is Accomplice—Instruction.** Where it is admitted that, if the defendant is culpably implicated in the theft at all, the witness was an accomplice, the question of whether he was an accomplice is a question of law for the court, and not a question of fact for the jury, and the jury should be so instructed.

4. **Trial—Charge on Good Moral Character.** An instruction relating to the previous good character of the defendant qualifiedly approved.

5. **Evidence—Accomplice Testimony—Insufficient Corroboration.** A conviction will be set aside where the state's case rests almost wholly upon the testimony of an accomplice, corroborated only by circumstances not inconsistent with the innocence of the accused, amounting at most to a mere suspicion.

Appeal from District Court, Nowata County; C. W. Mason, Judge.

D. W. Jolliffee was convicted of cattle larceny, and he appeals. Reversed and remanded.

Bert Van Leuven, J. I. Howard, and A. M. Beets, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J.  D. W. Jolliffee, plaintiff in error, hereinafter referred to as the defendant, was by information filed in the district court of Nowata county, March 18, 1919, charged with the theft of 12 head of cattle, the property of Marion Dawson.  At the trial, November 4, 1919, the jury returned a verdict finding the defendant guilty as charged, without assessing the penalty.  After a motion for a new trial was heard and overruled, on November 8, 1919, the court pronounced judgment upon the verdict, assessing the punishment at confinement in the state penitentiary at McAlester for a term of 7 years.  Thereafter, on the 28th day of January, 1920, the defendant filed a motion for a new trial on the ground of newly discovered evidence, which motion was later by the court overruled.  From the judgment and orders made the defendant appeals.

The undisputed evidence is to the effect that Marion Dawson was the owner of the 12 head of cattle involved in this action; that he had resided at Watova in Nowata county for a number of years, during which time he had been extensively engaged in grazing and raising cattle; that during the fall of the year 1918 he had placed 140 head of steers on premises belonging to Ocie Freeman; that Ocie Freeman was a negro, residing about a mile from the pasture or inclosure in which these cattle were running; that about the 3d day of December, 1918, Freeman discovered that the fence inclosing this pasture had been broken down, and that some of the cattle had escaped to the commons and lands adjacent; that Freeman had these cattle rounded up and driven back into the pasture, and the fence repaired, and upon counting the cattle found that 12 head of steers were missing.  Later he discovered a place in the wire fence inclosing the pas-

ture where there were indications that some posts had been pulled up and the fence laid on the ground, and cattle tracks and tracks of two horses were found, leading away from the pasture. Later these tracks were traced some miles distant, towards Coffeyville, Kan. Dawson and his employes made inquiry at Coffeyville, and found that H. D. Barnett, the owner of a meat market there, and an extensive dealer in cattle, had purchased these 12 head of cattle from Al Spencer. It appears that the defendant Jolliffee was a son-in-law and associate or employe of Barnett in the buying and disposing of cattle; that he was for some time the chief buyer for the concern; and that he negotiated the purchase of these 12 head of cattle. Four of the 12 head so purchased by Barnett had been slaughtered and the other 8 head had been placed in a wheat pasture of Barnett's, along with a number of other cattle belonging to him. Upon inquiry by Dawson, Barnett exhibited the hides of the slaughtered animals, which were identified by Dawson by the brand used by him. Barnett then informed Dawson and his employe where the other 8 head could be found. Barnett, being satisfied that the cattle were stolen and belonged to Dawson, voluntarily turned them over to him.

The testimony of Al Spencer is to the effect that he, assisted by one Hill, stole these cattle from the Freeman pasture the night before they were sold to Jolliffee, pursuant to a previous agreement with the defendant, and that the defendant met Spencer with the cattle about 5 miles south of Coffeyville, where he paid for them with a check of the amount of $500, drawn on the account of Barnett; that Spencer, before reaching the Kansas line, turned and rode back towards Lenapah. Later he appeared in Coffeyville, and, with the aid of the indorsement of an employe of Barnett, cashed the check given him by Jolliffee, Spencer was arrested soon afterwards for this and other thefts, and placed in jail in Nowata county.

After the preliminary trial in this case, and while the case against Spencer was pending, Spencer escaped from jail and fled to Kansas, where he committed other thefts, and fled to Colorado, being later apprehended in that state. He was then returned to the Kansas authorities, where he was being held at the time of the trial of this defendant.

The main portions of the testimony of Al Spencer taken at the preliminary hearing, constituting the foundation of the state's claim that this defendant was an accomplice and implicated in the theft, are as follows:

Examination by State.

"Q. Are you acquainted with D. W. Jolliffee? A. Yes, sir.

"Q. How long have you known him? A. About 3 or 4 years.

"Q. What, if any, transaction did you have with him on the 3d day of December, 1918? A. Sold him some cattle.

"Q. Did you have any agreement with him about these cattle? A. Yes, sir.

"Q. Just state to the court what that agreement was. A. Well, I made a deal with Mr. Jolliffee to sell him some cattle.

"Q. Where were you? A. At Coffeyville.

"Q. Just state exactly, as well as you can, just what the conversation was. A. We was talking about some cattle, and I said I would sell him some; I first was going to sell him some heifers of my own, and I talked to him about some other cattle.

"Q. Did you tell him who the cattle belonged to? A. I told him when he got them.

"Q. Al, state what the conversation was—as near as you can the words you used. A. Well, when he took the cattle I

told him where they belonged, and I told him after he took them he would have to get away with them—that they might get him—and he asked me which ones to kill first, and I said I didn't know, that there was some big steers there.

"Q. This was on the day on which you had this agreement to go ahead and get these cattle? A. I made the deal with him, and we had talked about who they belonged to, and he said he would buy the cattle.

"Q. What was the date on which you first talked to him about the cattle? A. I believe it was about a week before I took them to him.

"Q. At that time did you have an arrangement about when and where you was to meet him? A. We was to meet along the road between Lenapah and Howden—no particular place.

"Q. Now, did you see him any more from that time up until the date you delivered them to him? A. No, sir.

"Q. Did he meet you there as per your agreement? A. Yes; we met along the main road.

"Q. Now, what kind of cattle was these? A. Well, they was a going on 3 and 4 old steers; that's what I would take them to be.

"Q. Did they belong to you? A. No, sir.

"Q. Did you take them away from somebody else? A. Yes, sir.

"Q. When did you get them? A. I got them the night before he received them.

"Q. You are acquainted with the value of cattle, are you not—you are a cattle man? A. I have handled a good many cattle; yes, sir.

"Q. Do you know what the market price of stock was at that time? A. No, I don't.

"Q. I will ask you to state what was the agreement you had between you and Mr. Jolliffee as to the splitting of the

proceeds? A. Well, the only talk we had, he asked me what they was worth, and I told him what I thought they ought to be worth.

"Q. What did you tell him they ought to be worth? A. Around $900, and I finally agreed to take $500.

"Q. I will ask you to state at the time you had the first conversation with Mr. Jolliffee if you told him who those cattle belonged to? A. I never told him at that time, but he knew they did not belong to me. I told him when I delivered them to him.

"Q. You did tell him when you delivered them to him who they belong to? A. Yes, sir."

### Cross-Examination.

"A. I never told him I was a thief, but he knew that I was going to steal them.

"Q. You think a man buying cattle is a thief? A. If he knows that I am a thief.

"Q. Will you please tell what the understanding was? A. Well, he knows what the understanding was.

"Q. Then you told him you was going to steal some cattle? A. Yes, sir; that was our understanding.

"Q. Now, I want to discuss another question. Had you ever stolen any cattle before? A. No, sir.

"Q. Ever stolen anything else? A. No, sir.
* * *

"Q. Did you know what cattle you was going to steal when you made this bargain? A. I had an idea.

"Q. Yes; you knew what cattle you was going to steal? A. I knew what I figured on getting.

"Q. And if the figures did not turn out just right you was going to steal somebody's else cattle? A. I don't know whether I would or not. I figured on taking some out of the bunch I got.

"Q. Since you admit you stole the cattle, who helped you steal them; who help you steal those cattle? Did you have any assistance to steal those cattle? I would like to know what is the matter with that question, Did you have assistance in stealing them? A. Yes; there was somebody with me.

"Q. Who was it? A. I don't know that I have to tell.

"Q. The court put you under oath, and I have asked you who helped you steal those cattle, and—I don't believe I want to ask you any more questions. That is all. I don't want to push you. * * *

"Q. Where was that arrangement put through? A. We were together at Coffeyville, Kan.

"Q. Where at? A. Well, I believe I saw Mr. Jolliffee at the meat market.

"Q. Barnett's meat market? A. Yes, sir.

"Q. Who was present? A. I was in the shop, and he was in back end.

"Q. Back end; do you mean Mr. Barnett's meat market? A. Yes, sir.

"Q. Yes; but what do you mean by the back end? A. The back part of it.

"Q. You mean behind the counter? A. No, sir; back there.

"Q. Where they make sausage? A. Yes, sir.

"Q. Who was present? A. Nobody; there was a man in the building, but he did not hear our conversation.

"Q. How did you come to start that talk? A. I had sold him some cattle before that, and we was up there, and I had some cows to sell, and we got to talking about this other stuff, and he said he would buy it.

"Q. Wait a minute; pardon me; what do you mean by this other stuff? A. The cattle Mr. Jolliffee bought.

"Q. You was talking to him about this other stuff, and how did you come to talk to him about it? A. First I asked him if he wanted to buy some cattle of my own, and the next time I saw him I decided to keep mine, and I said I had some stuff in view—

"Q. What do you mean by stuff? A. Wet stuff; stolen property.

"Q. How did you get it into your craw to talk to Mr. Jolliffee about taking that kind of property? A. I heard that he was that kind of a man; he came to my place and told me that they was going to look in my pasture for wet stuff, and if I had any stolen to get rid of it.

"Q. And you never did that before? A. No, sir."

From the testimony of others it appears that, after Spencer was arrested and put in jail, the sheriff accorded him the privileges of a trusty, and while he was in the sheriff's office, on the pretext of using the telephone, he walked out and made his escape in a stolen automobile, and fled to Wilson county, Kan. There he committed burglary and larceny, and fled to Colorado, where he was arrested and returned to the sheriff of Wilson county, Kan. After the trial of this case he was again returned to the custody of the sheriff of Nowata county, where he pleaded guilty to and was sentenced to the penitentiary on three separate criminal charges. One of these was a theft subsequent to the theft involved in this case, and another was prior to this theft.

Defendant Jolliffee claims that he purchased these cattle in good faith, in the usual course of business, and that, as he estimated it, he paid for them the current market value, about 6 cents per pound, for cattle in their condition; that some of these cattle were in very poor condition and had to be fed for a season before they would be fit for slaughtering. After the cattle were purchased they were driven onto the scales near

the slaughter pens and weighed, their total weight being 8,830 pounds.

The testimony as to the prevailing price and value of steers of the kind and character of these here in question was conflicting, the estimated market price fixed by different witnesses varying from $45 to $80 per head.

A number of witnesses testified that the defendant's reputation for truth and honesty was good, and there was no evidence to the contrary.

That this defendant was implicated in the theft of these cattle, as stated by Spencer, was nowhere corroborated, unless by the fact, if it be a fact, that the price paid by the defendant for these cattle was so inadequate as to raise an inference of guilt, or unless the fact that the defendant and his helper met Spencer with the cattle some distance from town, and before reaching their destination gave Spencer a check for the cattle, and that Spencer did not accompany the cattle to the slaughter pens, but went into town alone later that day to cash the check for the purchase price, raises such inference. These facts constituted an unusual transaction, and might possibly be deemed a corroboration of a part of Spencer's story. On the other hand, these facts are not inconsistent with the defendant's claim that he bought these cattle in good faith. There is no direct testimony on the part of any other person implicating the defendant in the original theft; the only testimony to that effect is the testimony of the confessed thief, Spencer, coupled with the circumstances just related.

The defendant objected to the introduction of the testimony of Spencer taken at the preliminary hearing, on the ground that the presence of Spencer was available; that the sheriff of Wilson county, Kan., had offered to surrender Spencer to the sheriff of Nowata county upon payment of the ex-

pense incurred in procuring his return from Colorado; and that the obligors on Spencer's bond in one of these cases pending against him in Nowata county offered to pay this expense. It is claimed that the county attorney of Nowata county did not want Spencer returned at that time, possibly to avoid a further damaging cross-examination of this witness on the stand in the presence of the jury, and because, as was shown, the county attorney had a personal pecuniary interest in allowing Spencer to remain in the custody of the Kansas sheriff in order that he might profit personally in the forfeiture of Spencer's appearance bond. In support of this contention the defendant introduced the following stipulation:

"In the District Court of Nowata County, Okla.
"State of Oklahoma, Plaintiff v. Al Spencer, J. R. Martin, Wendell Powell, R. L. Holland, and J. L. Armstrong, Defendants. No. 3409.

"It is hereby stipulated and agreed by and between C. F. Gowdy, county attorney for Nowata county, and E. E. Sams, attorney for Al Spencer, the principal defendant on the bond sued upon in said cause, as follows, to-wit:

"That said suit shall be compromised and settled upon the following terms and conditions, to wit:

"(1) The attorney for the defendant is to confess judgment in the sum of $1,000.

"(2) The county attorney is to consent to the setting aside of the forfeiture of the defendant's bonds in cases numbered 792, 800, and 815, being all of the appearance bonds of Al Spencer in Nowata county.

"(3) It is agreed that the $2,000 cash in the hands of the court clerk is to be disbursed as follows:

"(a) $750 to the county treasurer of Nowata county, being the county's three-fourths interest in the judgment to be confessed.

"(b)  $250 to C. F. Gowdy, county attorney, being 25 per cent. of the recovery in the above-entitled suit.

"(c)  $750 to Mrs. Al Spencer, she being the person who furnished the money now in the hands of the court clerk.

"(d)  $250 to E. E. Sams as attorney fees.

"The above stipulation to be subject to the approval of the district court for Nowata county, and not to be of any force or effect or binding on the parties until the district court by his order shall approve the same.

"C. F. Gowdy,
    "County Attorney.

"E. E. Sams,
    "Attorney for Defendant Al Spencer."

The court subsequently refused to approve this stipulation.

The defendant urged that the transcript of the testimony of Spencer taken at the preliminary hearing should not be introduced, for the reason that the presence of the witness in court was available, and that, under these circumstances, the defendant had a constitutional right to be confronted with this witness; that his detention in Kansas was collusive and unfair to the defendant; and that his escape and absence from the state was due originally to the negligence of the sheriff of Nowata county in permitting his escape from the county jail.

If the witness can with reasonable diligence be obtained at the final trial it is the right of the defendant to require his presence. It frequently happens that the cross-examination of a witness at a preliminary hearing, occurring as it does soon after the offense has been committed, when not all of the facts relating to the commission of the crime are known, is more or less perfunctory, and that, by the time the cause comes on for

final trial, the defendant is better able, by reason of more time and research, to conduct a thorough cross-examination in the presence of the jury. Clearly, the county attorney, representing the state, would have no right to take any affirmative action calculated to prevent the personal appearance of the witness. As to whether the county attorney did not desire the presence of the witness Spencer, and whether he did anything to prevent his presence at the trial, was an issue raised before the court at the trial upon which testimony was heard and considered, and the finding of the trial court that the witness was not absent by reason of any collusive conduct on the part of the county attorney will not be disturbed. In the case of Davis v. State, 20 Okla. Cr. 203, 201 Pac. 1001, it was stated:

"To say that no diligence is required to produce the witness in open court, where it is possible to do so, is not in keeping with the spirit nor the letter of the constitutional guaranty that a defendant in a criminal action has a right to be confronted face to face with the witnesses against him."

For the reasons and application to particular cases of this rule, see the body of the opinion in the Davis Case, and other cases therein cited. In the instant case the prosecuting attorney was in no way responsible for the fact that this witness was a fugitive from justice in another state; the most that can be said is that he refused to put into motion the means by which he might have obtained his surrender by the officers of the other state to the officers of the trial court. We think it would have been commendable in the county attorney to have done this, but we are not ready to disturb a long line of decisions of this and other courts, and say that it is necessary for a county attorney, in the absence of actual collusion, to make an effort to procure the attendance of a witness then held in custody by officers of another state, as a condition precedent to the right to introduce in evidence a transcript of

the testimony of such fugitive from justice taken at a preliminary hearing or former trial.

From a perusal of all the testimony in this case it appears that the state at various times sought to show that the price paid to Spencer for these 12 head of cattle was inadequate. It is urged that the court erred in permitting testimony to be introduced as to the price of other cattle purchased and sold at other times and places; among other such instances Dawson, the owner of the stolen cattle, over the objections of the defendant, testified as follows:

"Q. Was there any difference in the market price of that class of steers, that age and weight, between December 1, 1918, and January 1, 1919? A. Yes, sir.

"Q. What was the difference? A. Well, they got higher all along from the fall on up to spring; they got higher.

"Q. I believe you said you had about 600 head of the same class and grade of cattle as the 140-odd head you had up there. Where were they running in the early fall of 1918? A. Part of the time at the ranch and part of the time in the Osage.

"Q. Where did you buy them? A. Bought them of Pat Manning. He bought them on the Fort Worth market, and shipped them up here.

"Q. How many? A. About 1,200 head.

"Q. Did you have occasion to sell any of the cattle about the latter part of October? A. I sold 517 head to Henry Faulkner.

"Q. What was the age of those cattle? A. Just the same as these, coming 3's and 4's.

"Q. How did they compare in weight? A. Just about the same.

"Q. When did you make that sale? A. I made it the 29th day of October.

"Q. What did you get per head for those cattle?

"Mr. Van Leuven: We object to this as not proper rebuttal, incompetent, irrelevant, and immaterial.

"Mr. Moses: We think it is in rebuttal of the testimony of witnesses Burnett and Kimes for the defendant as to the market value of cattle.

"Mr. Van Leuven: The sale of cattle that he made to Faulkner, other cattle in October, is not proper rebuttal.

"Mr. Moses: We think it is.

"The Court: I think so. Overruled.

"Mr. Van Leuven: Give us an exception."

"A. $73.

"Q. Now I will ask you if you had occasions, or if some one for you had occasion, to sell any of those steers in the month of December on the Kansas City market? A. My brother did at one time.

"Q. How did that steer compare in age, size, and weight with the remainder of the cattle that were up there at this darkey's? A. I suppose they were the same kind—came out of the same bunch.

"Q. I will ask you to state whether or not this is the account sale (handing witness a paper) of what that animal brought on the Kansas City market? A. Yes, sir.

"Mr. Moses: We offer this account sale in evidence.

"Mr. Van Leuven: We object to the evidence of this particular sale as not being proper rebuttal testimony, and not competent to prove the market value of the steers involved in this case.

"The Court: What is the date of that?

Mr. Van Leuven: December 31, 1918.''

Then following an extended argument between counsel and court with reference to the admissibility of this class of testimony. Finally the objection was overruled, and the witness was permitted to testify that this particular steer was sold on the Kansas City market on December 31, 1918, for $88.75.

To set out all of the testimony of this character that was introduced would prolong this opinion unnecessarily. Suffice it to say that we think that this and other like testimony found in the record was incompetent and prejudicial. This theft, excluding the testimony of the accomplice Spencer, was nowhere brought home to the defendant, and the jury might have inferred, and possibly did infer, that because the defendant bought these cattle at approximately $45 per head he at least had guilty knowledge that they were stolen property. We think the price paid for and received for cattle culled out of a herd of 1,200 head at another time and place was improper, and constituted no correct standard by which the jury would be authorized to estimate the value of the particular cattle here in controversy.

On redirect examination of Mr. Barnett, the father-in-law and business associate of the defendant, defendant sought to show, as affecting the motive, possible bias and malice and the credibility of the witness Spencer, that Barnett had made complaint against Spencer in Nowata county for the theft of these cattle, and the court refused to permit this showing to be made. The record elsewhere discloses that Barnett, and possibly the defendant, did sign the original complaint against Spencer. Originally complaint was made against Jolliffee and Barnett, jointly, and upon the hearing of the motion for a new trial on the ground of newly disclosed evidence the county attorney stated:

''Well, my first information about any case at all was a complaint charging Barnett and Spencer, and possibly Jolli-

ffee, and when I found it out I think I had them signing complaints against each other."

The exclusion of the testimony of witness Barnett, of which complaint is made, is as follows:

"Q. Did you after these cattle, or after these steers— after you turned them over to Dawson, and found out that Spencer had stolen them before he sold them to Mr. Jolliffee here, did you take any action against Spencer?

"Mr. Moses: Well, that is objected to as incompetent, irrelevant, and immaterial.

"Mr. Van Leuven: To show his attitude in this case, if your honor please.

"Mr. Moses : This man is not on trial for any offense.

"The Court: Sustained.

"Mr. Van Leuven: Well, Spencer is an accomplice, and he has testified here.

"Q. Did you swear out a warrant for Spencer?

"Mr. Moses: Objected to as incompetent, irrelevant, and immaterial. We think the court has passed on that once.

"The Court: Sustained."

As affecting the interest, bias or prejudice of the witness Spencer towards the defendant, we think it was proper and competent to show that the witness himself was being prosecuted for this offense by Barnett and the defendant, and that it was prejudicial error to exclude such showing. Yoder v. State, 18 Okla. Cr. 637, 197 Pac. 848; Gilbert v. State, 8 Okla. Cr. 543, 128 Pac. 1100, 129 Pac. 671.

The defendant objected and excepted to instruction No. 7 given by the court, as follows:

"You are instructed that the prosecution in this case uses the testimony of a witness who may be culpably implicated in

the commission of the crime of which the defendant is accused; that is, he may be one who knowingly and voluntarily co-operated or aided or assisted in the commission of the crime of which the defendant is accused; and whether or not he is such a person is a question of fact for you to determine from the evidence before you. If you believe from the evidence in the case that such witness is implicated in the crime charged in the information, as above defined, then in law such witness is an accomplice and you are instructed that a conviction cannot be had upon the testimony of an accomplice unless such accomplice be corroborated by such other evidence as tends to connect the defendant with the commission of the offense and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof, but such other evidence, to be sufficient to corroborate the evidence of an accomplice, must tend to connect the defendant with the commission of the crime of which the defendant is accused.''

The whole foundation of the state's case rested on the theory that the witness Spencer was an accomplice. If the defendant was culpably implicated in this transaction at all, the things done by Spencer, as shown by the evidence, as a matter of law made him an accomplice; otherwise the defendant under the testimony was guilty of no crime, and it was error to submit that issue as a question of fact to the jury. Where the acts and conduct of a witness are admitted, it becomes a question of law for the court to say whether or not these facts and acts make the witness an accomplice. McKinney v. State, 19 Okla. Cr. 94, 198 Pac. 108; Moore v. State, 14 Okla. Cr. 292, 170 Pac. 519; Cudjoe v. State, 12 Okla. Cr. 246, 154 Pac. 500, L. R. A. 1916F, 1251. This error may not have been prejudicial, because the jury from the testimony must have concluded that Spencer was indeed an accomplice. Under the testimony, no other conclusion could have been reached.

The defendant also objected and excepted to instruction No. 8, which is as follows:

"When a person is charged with a crime the courts permit such person to introduce testimony of his previous good character for the consideration of the jury. You should consider the evidence permitted to go to you in this case on that point with all the other evidence and give it such weight as you may deem it to be entitled, and yet, the court instructs you that evidence of good character is no defense against crime proven beyond a reasonable doubt. If the defendant is proven guilty of the crime charged beyond a reasonable doubt, any good moral character borne by him in his community is no defense in this prosecution."

While this instruction, upon careful analysis, is not a misstatement of the law, the qualifying clauses after the word "yet" might have confused the jury. Up to that point the instruction was complete and sufficient. The defendant's previous good character, of itself, considered along with all the other testimony, might have raised a reasonable doubt in the minds of the jury.

In an early case (Wilson v. State, 3 Okla. Cr. 714, 109 Pac. 289) a general instruction on the good character of the defendant, similar to the one given here, excluding the qualifying clauses, was approved. This was practically followed in Holmes v. State, 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300. See, also, Edgington v. U. S., 164 U. S. 361, 17 Sup. Ct. 72, 41 L. Ed. 467, and annotations in 10 A. L. R. 83.

It is next urged that, as a matter of law, the testimony of the accomplice Spencer to the effect that the defendant was implicated in the theft of these cattle was not corroborated. In the case of Thompson v. State, 9 Okla. Cr. 525, 132 Pac. 695, the defendant was convicted of a violation of the prohibitory law. Presiding Judge Doyle, speaking for the court in reversing the case, said:

"There is no evidence in the record, except that of the complaining witness, that tends to connect the defendant with the commission of the offense charged. Upon his own testimony the complaining witness is an accomplice, and a conviction cannot be sustained upon his uncorroborated testimony."

That no person shall be convicted of a crime upon the testimony of an accomplice must be construed to mean that the person accused must in some manner be culpably implicated in the commission of the crime. Hendrix v. State, 8 Okla. Cr. 530, 129 Pac. 78, 43 L. R. A. (N. S.) 546.

In this case there is no corroboration of the testimony of the confessed thief, unless it may be deduced from the evidence that the defendant purchased these cattle for a grossly inadequate price, upon which point the testimony is conflicting, or unless the fact that the defendant met the witness Spencer with the cattle outside of Coffeyville, as they were being driven towards that point, and paid for them there, shows that he had guilty knowledge of their being stolen property. To us it seems that neither of these facts, though established to the satisfaction of the jury, is inconsistent with the good faith and innocent motives of the defendant.

Neither the defendant nor his associate, Barnett, made any effort to conceal the transaction; on the contrary, the hides of the slaughtered cattle were promptly exhibited to the owner, Dawson, upon his making inquiry; Dawson was informed by Barnett of the whereabouts of the other cattle, and steps were taken immediately by Barnett and the defendant to prosecute the witness Spencer. We think that as a matter of law the testimony of the accomplice was not corroborated in the sense contemplated by our statute (section 5884, R. L. 1910), providing:

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence

as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

For the reasons stated in this opinion, this cause is reversed and remanded.

DOYLE, P. J., concurs.

MATSON, J., concurs in the result.