## HARVE POWELL v. STATE.

No. A-3740.    Opinion Filed June 19, 1922.

(207 Pac. 570.)

(Syllabus.)

1.   Receiving Stolen Goods—Information Sufficient.—Information examined, and held sufficient to charge the crime of receiving stolen property.

2.   Indictment and Information—Charging Crime According to Facts in Evidence at Preliminary Examination.—Where preliminary examination is not waived and evidence is taken, the county attorney is authorized to file an information in the trial court charging the crime according to the facts in evidence at the preliminary examination.

3.   Evidence—Lack of Corroboration of Accomplices' Testimony—Receipt of Stolen Property.—For reasons for holding the evidence insufficient to support the conviction, see body of opinion.

Appeal from Superior Court, Okmulgee County; R. E. Simpson, Judge.

Harve Powell was convicted of receiving stolen property, and he appeals. Reversed and remanded, with directions.

Morgan, Pinkston & Hepburn, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

MATSON, J. This is an appeal from the superior court of Okmulgee county, wherein Harve Powell was convicted of the crime of receiving stolen property, and sentenced to serve a term of 3 years and 6 months imprisonment in the state penitentiary.

It is first contended that the information is insufficient. The question of the insufficiency of the information was first raised by general demurrer, and secondly by objection to the introduction of evidence, upon the ground that the information was not sufficient to charge the crime of receiving stolen property or any other offense under the laws of this state. The information follows the form approved by this court in the case of Price v. State, 9 Okla. Cr. 359, 364, 131 Pac. 1102, and is sufficient.

It is next contended that the trial court erred in overruling the defendant's plea in abatement on the ground that he had never been held to answer the particular offense of receiving stolen property. This assignment of error is purely technical. It is urged that because the transcript of the examining magistrate discloses that after the preliminary examination the defendant was held upon the charge of "receiving and aiding in the sale of stolen property," he was not held to answer to the charge of receiving stolen property. As the preliminary examination was not waived, the county attorney was authorized to file an information in the district or superior court charging the crime committed according to the facts in evidence at the preliminary examination. Williams et al. v. State, 6 Okla. Cr. 373, 118 Pac. 1006; Little v. State, 21 Okla. Cr. 1, 204 Pac. 305. Further, the indorsement

of the examining magistrate in the language above set out was sufficient and not misleading.

It is next contended that the trial court erred in overruling the defendant's motion at the conclusion of the state's evidence for a directed verdict of "not guilty."

It is also contended that the evidence in this case is wholly insufficient to sustain the conviction, in that there is no sufficient corroboration of accomplice testimony to meet the requirements of the statute. These assignments of error involve a consideration of the entire evidence.

The defendant was jointly informed against with O. C. Hart and J. E. Cline with having—

"unlawfully, feloniously, and knowingly received and bought from some person to the county attorney unknown * * * one five-passenger Ford touring car of the value of $500, the personal property of and taken from the possession of one Charles Cameron, the said Harve Powell and O. C. Hart and J. E. Cline well knowing the said property to have been stolen from the said Charles Cameron," etc.

The state took a severance and elected to try the defendant Powell first. On the trial the codefendants Hart and Cline voluntarily testified against this defendant, waiving all privileges and immunities.

If a conviction were justified in this state on the uncorroborated testimony of accomplices, this conviction should stand, as the testimony of Hart and Cline is sufficient, if believed, to authorize a verdict of guilty, but section 5884, Rev. Laws 1910, provides that—

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely

show the commission of the offense or the circumstances thereof."

Let us review the testimony of the various witnesses in the light of the requirements of the above statute.

Charles Cameron, the owner of the Ford touring car in question, merely testified to the theft thereof from his garage in the town of Haskell on the night of February 16, 1919, and also to the marks, etc., by which the car could be identified.

Roy Heaton testified that he lived at Haskell and was acquainted with the Ford touring car owned by Charles Cameron; that he went to Henryetta and saw the car in a building down by the fire department. This witness testified to nothing that tended to connect the defendant with the receipt of the car after its larceny.

J. E. Cline, codefendant, testified that—

He was a clerk in a grocery store at Henryetta, that he never bought a Ford car from this defendant, that on the morning of February 17, 1919, he went to the Miners' National Bank to make a deposit, that some one called him, and he looked back and saw Powell and Hart and a fellow that gave his name as Green standing there. "I turned to Powell because Powell knew I was on a trade to sell a Studebaker car. He asked me if I had bought the car yet. I said, 'No.' This fellow spoke up and said he had one to sell. I asked him what kind. He said five-passenger Ford, almost new. I asked him if he could make a bill of sale. He said, 'Yes.' I asked Powell if he would sign the bill of sale on this car. He said he thought it was all right—would sign the bill of sale. We went and got a bill of sale, and then went back to Powell's car, which was standing in front of the bank. We got in his car, drove down Main street to the Frisco Depot, went a block north, then turned west on Broadway one block, then four or five doors west on Trugeon, and Green was standing on a

porch there. He got in the car, and we drove west on Trugeon until we reached Main street and Green said he would make out the bill of sale. He made it out. I paid him $250 for the car. I paid him in cash. The car at that time was just across the street from Hart's house and a little west of Powell's house. After that we started back to town in Powell's car, Powell, Green, and myself. I got out of the car at Eighth and Main, and Hart drove the Cameron car over there. I got in the Cameron car with him, and we drove out south about a mile and a half, and Hart changed the numbers on the car by filing them off and putting new numbers on with a stencil. After that Hart came to me, and wanted to buy the car back, and I sold it to him for $290. After that Powell came to me at the store and asked me if I had sold the car to Hart; said there was a car they were having trouble with down at the garage. He believed it was the same car. We drove down to the garage to see if it was the same car, and Powell looked at the car and said, 'Yes; that's the car.' A day or two later Hart told me they were having trouble over the car, and it looked like if I didn't take the car I would lose my money and the car too.''

Cross-examination: Witness said that about three weeks before he bought this car he had told Harve Powell to be on the lookout for a car for him if he could find one cheap; that he did not understand Powell to be the owner of this car; that he understood Jim Green to be the owner of the car; that Hart and Powell did not sign the bill of sale in the same place Green signed it; that he thinks they signed it as witnesses; that Powell never told him that the car was his, or that he had an interest in it.

O. C. Hart testified: That he knew some things about the Cameron car. That he first saw the car back of Harve Powell's house about 7 or 8 o'clock in the morning of the day they sold the car to Cline. That the fellow Jim Green also went under the name of Cotton Wilder. Witness had seen Jim Green, or Wilder, two or three times before that, and

had bought one car from him before that. Witness also corroborates Cline's statements as to the purchase of the car and the changing of the numbers. Witness also stated that he got the stencils to change the numbers with at Harve Powell's house, and got the file over at his own house. That two or three weeks after that he bought the car back from Cline, and took it to the Barfield garage and traded it to Fred White for a Ford roadster. That after he sold the car to Fred White he had a talk with Powell in regard to the car. That Powell came to his house two miles west of town, and said he would have to go down there and do something with the car; "It's in the garage and old dad's blowing his head off to everybody that comes in about its being a wet car, something wrong with it; that they would have to get out of there." Next morning witness went to town, and met Powell, and Powell then said that "Slim," this policeman, had found it was down there and had looked it over. He said he could square it with "Slim" for $25. Later witness went to J. E. Cline, and Cline took the car back, and was in the possession of the car at the time witness was arrested. Witness further testified that he was not related to Harve Powell, but that Homer Hart was a brother of his. That Harve Powell introduced Jim Green to him under the name of Cotton Wilder. That witness had not seen Jim Green since the day they made the deal to J. E. Cline on the car.

Cross-examination: Witness testified that he was arrested on this charge the evening before Harve Powell was arrested. That the county attorney told him he could plead guilty and take 2 years, but never said anything about convicting Powell. That the county attorney never promised him that if they could stick Powell that they would turn him loose. That he did not get any of the money that Cline paid Jim Green. That on the morning the car was sold to Cline, about 7 or 8 o'clock, the witness took the car from Powell's house

and drove it two blocks north over on Division and got some springs and a mattress and brought them over to his house. Witness denied ever trying to sell the car. That the car was sold to Cline about 2 or 3 o'clock in the afternoon. Witness denied knowing that the car was a stolen car at the time it was sold to Cline. In other respects the witness' testimony on cross-examination was similar to that given in chief.

W. W. Melton testified that he was chief of police of Henryetta in March, 1919, and located the stolen car in a little garage in an alley back of Harrison's store in Henryetta, and took it to the fire station, where it was afterwards identified by Cameron and turned over to him. That defendant Powell was arrested the next evening after the car was found.

Fred White testified that he lived at Henryetta and was in the transfer business; that in March, 1919, he worked at Barfield's garage; that about that time he bought a Ford car from O. C. Hart, and about a week afterwards sold the car back to Hart; that during the time witness owned the car he kept it in Barfield's garage; noticed that numbers of the car were larger than witness had ever seen on other Ford cars; during time car was in Barfield's garage saw Harve Powell and J. E. Cline drive in there in a Ford, but didn't see "what they done." W. J. McGuffey was there at the time; he is commonly called "Dad."

W. J. McGuffey testified that he was working in Barfield's garage in March, 1919, as a mechanic; saw the car there, don't remember how long it was there; saw Powell and Cline drive up there once while car was there. Witness was busy in the office at the time, but got up and walked to the doorway, and heard Powell remark to Cline, "That's the car"; that was all witness heard said; he was looking at the car at the time; don't think Cline ever got out of the car he was riding in.

Mrs. Homer Hart testified that she lived in Henryetta and knew defendant Powell, and remembered when he was arrested; that defendant came to her house about 6 o'clock of the day he was arrested, looking for her husband; that her husband wasn't there; that Powell said Broaddus told him he had a warrant for him and Homer; he said O. C. Hart was telling everything; defendant hadn't been arrested at that time; that her husband left that night, and has been gone since then.

Cross-examination: Her husband is a brother of O. C. Hart; that Powell came to her house after her brother-in-law had been arrested, but witness don't know how long; that Harve Powell's wife was with him at the time.

Defendant's Evidence.

W. M. Jackson testified that he knew O. C. Hart; that in February, 1919, witness was working in Pounder and Waller's garage in Henryetta; that on the morning of the day this stolen car was sold to J. E. Cline witness saw Hart with the car; that was about 6 o'clock; that a stranger was with him; that they drove up in front of the garage; that Hart wanted to sell the car to witness.

Cross-examination: Don't know how many "wet" cars Hart has been mixed up in; never saw the boy before that time with Hart; don't know whether the car Hart tried to sell was the Cameron car or not.

Redirect: On the morning Hart tried to sell me this car witness took Harve Powell's car down to his house, asked him if he was going to town. Witness afterwards drove Powell's car to town, ate breakfast, and come back to Powell's house, and Powell then came to town with witness in the car.

Recross: The fellow with Hart offered to sell the car for $250; it was practically a new car; "I asked him, 'Why

sell the car so cheap?' He said, 'Going out of business.' It was something like a couple of days after that that I heard Hart was arrested—might have been longer; could have been a week; can't fix the date. Hart said that if they didn't sell the car to me they were going to sell to a grocery man; understood afterwards that Cline bought the car; wasn't present, and don't know whether he did or not.''

Cleland Shank testified that he was working for defendant driving a livery car; that in April, 1919, he had a conversation with O. C. Hart in front of post office in Henryetta in which Hart told witness that if they could stick Harve Powell they would turn him loose.

Cross-examination: Conversation occurred just a few days after the preliminary examination. Hart said that Mr. Wallace told him that if they could stick Powell they would turn him loose. Hart didn't say anything about an agreement with Mr. Eaton, the county attorney.

Mrs. Homer Hart testified that she was at Harve Powell's house the day that O. C. Hart claims to have borrowed the stencils from Mrs. Powell; that she was there about 2 o'clock, and that O. C. Hart didn't come to the house that day. On cross-examination witness admitted she didn't tell this at the preliminary examination—said she wasn't asked anything about it.

Mrs. Harve Powell, wife of defendant, denied that O. C. Hart come to her house and got stencils to change numbers on car.

Harve Powell, defendant, testified:

That he was 33 years old, married; two children; had been in mining business, and was now operating a livery business; before coming to Henryetta had been manager of Midland Telephone at Porum, Okla. Had known O. C Hart 2

or 3 years; remembered occasion of Cline purchasing car from Jim Green; left home about 9 o'clock that morning; rode to town with "Doc" Jackson; never went to Hart's house about 7 that morning. "Some time before that J. E. Cline had told me he wanted to buy a car, and if I saw one worth the money to let him know; first met Hart and Green in front of Miners National Bank; didn't know Green; he was not Cotton Wilder. Cline came across and went into bank, when he came out by I asked him if he wanted to buy a car. I told him Hart and this fellow 'over there' had one; Cline walked over to Hart, and went to talking with them; Cline came back, and said to me, 'Do you reckon it is all right?' I said, 'I don't know; I suppose it is.' Cline said, 'Let's go and get a bill of sale.' We got a bill of sale at the Citizens' Bank. When we got back this fellow was gone. Cline asked Hart where he was, and Hart told him, 'He has gone down the street.' I said, 'Get in my car; let's drive.' We drove down on East Trugeon, and found this fellow called Jim Green—he got in the car. Hart said, 'Drive down Trugeon to my house.' We drove west on Trugeon to Tenth and Main, and they fixed up the bill of sale. I signed it as a witness, so did O. C. Hart; Jim Green made the bill of sale; then we drove to Hart's house. Hart got out in front of his house where the car was standing; that was the first time I had seen the car, the car had never been on my premises. When Hart got out I drove back towards town, and Cline got out at Eighth and Main, and Green got out at the post office; Green paid me $2. I did not know they were dealing in a stolen car; I never told Hart to go to my house and get stencils to change the numbers on the car. I never knew they changed the numbers on the car; never examined them. About two weeks after Cline bought the car I went into Cline's grocery store to buy some groceries, and J. E. Cline said: 'They are having a little stir-up about that car. Chief Melton told me I better go out there and get my car or my money back. I wish you would drive me out there.' I drove him out there, and he paid me $2 for the trip. I understood that before that Cline had sold the car back to Hart. After we got out to Hart's house Cline said: 'I want my money back.' I said, 'That's the best thing to do; if it is

stirred up that way that is the best thing to do.' I never told Hart we would have to go to the garage and do something about the car; never told Hart 'Slim' had found out this was a bad car, and that we could square it with 'Slim' for $25. We were out to Hart's place about 15 minutes. Hart refused to give Cline his money back. It was a few evenings after that that I drove Cline down to Barfield's garage to look at the car down there. Cline wanted to see if the car there— the one they were having the trouble over—was the same car he had bought from Green. We drove down there. They had been washing the car; it was wet with water, I got out of my car and looked at it. I said, 'It looks like the same car.' I made no examination of the car. My brother Tom first told me they had a warrant for me and Homer Hart. I had then heard that O. C. Hart had been arrested. My wife said, 'Let's go down to Homer's and see.' We went down there, and saw Mrs. Homer Hart. I asked if Homer was there. She said he hadn't come from work. I told her, 'O. C. Hart was telling a bunch of lies, and I understood Jim Broaddus had a warrant for me and Homer.' She said: 'I guess not.' That was all the conversation we had; I went back and went down town and found Jim Broaddus, and asked him if he had a warrant for me, and he said he had, and put me in jail.''

On cross-examination the testimony of the defendant was not materially different from that given on direct examination.

H. C. Dwiggins, a banker, C. P. Reynolds, grocer, Jim Stormont, chief of police, P. G. Waller, garage owner, J. E. Whitenton, banker, George W. Bailey, hardware dealer, and J. W. Pippin, all residents of Henryetta, testified that the defendant's general reputation for honesty in that community was good.

Mrs. Harve Powell, recalled, testified to the visit made by herself and husband to Homer Hart's house on the evening her husband was arrested. Her testimony concerning what

happened there at that time was the same as that given by her husband.

Harve Powell, recalled for further cross-examination, was asked if the trip made by him and Cline to O. C. Hart's house was made before or after Hart had been arrested, and replied, "I think he had; I don't know whether he had or not." Witness was then asked if Hart was not arrested after the car had been taken from Cline, and replied, "Jake (meaning Cline) had done lost the car at that time." The witness was then asked if the trip was necessary in order to locate the car over at the garage, and replied, "Let's see; I don't know whether it was before." He was then asked, "This trip out there was bound to have been before, wasn't it?" To which he replied, "If the car was found by Melton in this little garage." "I don't know whether Melton had taken the car or not, but Melton told him that he had better go out there and try and get his money back. I don't know whether Melton had the car at that time or not. I don't know whether Cline had been arrested or not." Witness was then asked if he didn't look the car over in Barfield's garage before he made the trip to see O. C. Hart. To which he replied, "I don't think we did; I don't know." Witness was then asked, "Didn't you make another trip out there to Hart's that same night after bringing Cline to town? Didn't you go back to Hart's place about midnight and have a conversation with him?" To which the witness answered, "No, sir." Witness was then asked, "Isn't it a fact you returned there along about midnight that same night and had a conversation with O. C. Hart in which you told him to stick to that bill of sale and say that this man Pete Wilder or Jim Green lived at Durant?" To which witness answered, "No, sir; I did not."

Rebuttal.

O. C. Hart was then produced as a witness for the state

in rebuttal, and testified that he never had any conversation with Cleland Shank to the effect that Mr. Wallace told him that if he would help convict Harve Powell he would go free. Witness also testified that Harve Powell made a second trip to his house on the same night that he and Cline were out there about 12 o'clock, and asked him if he was going to stick to the bill of sale of Jim Green and say that this Jim Green lived at Durant.

On cross-examination witness said he did not state anything about the second trip of Harve Powell to his house on that night when called as a witness in chief, because "he wasn't asked about it, and it didn't come to his mind"; that he had told the county attorney about this second trip when the preliminary examination was had.

J. E. Cline, recalled for the state, testified that he did not know where the tools came from with which the numbers were changed on the car; that O. C. Hart changed the numbers; that he gave all the money for the car to Jim Green; that when he sold the car back to O. C. Hart, O. C. Hart gave him a check for $290, "and I gave him back a check for $390." Witness also stated that he had known Cotton Wilder about 5 years before that, when Wilder was from 17 to 20 years old, but would not say that Jim Green and Cotton Wilder were the same person.

The foregoing was substantially all the evidence introduced in the case.

Is the evidence sufficient in law to sustain the conviction? We think not. The only evidence that directly tends to connect this defendant with the receipt of the stolen automobile is that which falls from the lips of the witness O. C. Hart, who is admittedly an accomplice. Hart testified that on the morning of the day after the car was stolen he saw it in the

back yard of the defendant Powell's residence property; that at 6 o'clock that morning Powell came to his (Hart's) house and tried to sell him this stolen car. Although it is disclosed by this record that Powell lived in a thickly settled part of town, not a single disinterested witness is brought by the state into court who testified to having seen Powell in possession of the car. Nor is any one produced who saw Powell at Hart's house trying to sell the car. True, the witness Cline testifies to facts which indicate that Powell was mixed up in the sale of this car to him, but Cline also testified that several days before that he had asked Powell, who was then in the livery business at Henryetta, to "look out for a cheap car for him." There is nothing in Cline's testimony, independent of the testimony of Hart, which indicates that Powell had knowledge at the time Cline bought the car that the car was stolen; at least, there is nothing in Cline's testimony which indicates that Powell had any more knowledge that the car was stolen at that time than Cline himself had, and if both of them had knowledge that the car was stolen, then Cline also was an accomplice of Powell's, and a conviction would not lie even upon the testimony of both Cline and Hart. The county attorney evidently took the view that both Hart and Cline were accomplices of Powell's; that they all had guilty knowledge that they were dealing with a stolen automobile, because he jointly informed against all three of them for this offense, and permitted both Hart and Cline to turn state's evidence against Powell.

The court is of the opinion that the evidence of both Hart and Cline is that of accomplices, and if this conviction is allowed to stand there must be found in this record evidence independent of those two witnesses which tends to connect the defendant with the commission of the offense. Is there any such evidence? The state asserts that the evidence is sufficient, but nowhere in the brief filed in behalf of the state is there pointed out any evidence tending to corroborate the

testimony of the accomplices. We fail to find any which we deem to be sufficient for that purpose. True, there is some evidence which would create a suspicion of the defendant's guilt, but not more, as we view it. The evidence of Mrs. Homer Hart and of W. J. McGuffey, if unexplained, might have that effect, but at most it only tends to prove that some time after the receipt of this stolen car the defendant Powell had then received information that the car was probably a stolen car.

This defendant bore a good reputation for honesty in that community, a number of the very best citizens and business men of Henryetta testified to that fact, and no effort was made to prove the contrary. He was a married man with a wife and two children, and had never been charged with crime before. Certainly his good reputation is entitled to great weight where there is so little evidence in the record independent of the testimony of accomplices which could in the slightest degree support the verdict. The state only demands the punishment of its citizens when their guilt has been clearly established according to the forms of law and by the rules of evidence prescribed for ascertaining their guilt. The law forbidding a conviction on the uncorroborated testimony of an accomplice is positive and peremptory. It is not intended to shield the guilty, but to protect the innocent because of the temptation of those jointly charged with crime to materially benefit by turning state's evidence. Defendant is not only entitled to a fair trial according to the forms of law, but he is entitled to require that the state prove his guilt beyond a reasonable doubt according to the prescribed rules of evidence, and unless the state does so prove his guilt the conviction is not according to law.

The court is of the opinion that there is no evidence in this record. independent of that of the accomplices, which tends in any way to connect this defendant with the com-

mission of the offense charged. Therefore it is our opinion that the evidence is legally insufficient to sustain the conviction, and that the judgment of conviction should be set aside on this ground; and it is so ordered.

For reasons stated, the judgment is reversed, and the cause remanded to the superior court of Okmulgee county for further proceedings consistent with this opinion.

DOYLE, P. J., and BESSEY, J., concur.