## HENRY CORNETT v. STATE.

No. A-6379.   Opinion Filed Feb. 16, 1929.
(274 Pac. 676.)

Hamilton, Gross & Howard, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was convicted in the district court of Jefferson county of robbery of the First National Bank of Addington, Okla., with firearms, and was sentenced to imprisonment in the state penitentiary for a term of 30 years.

The state called A. K. Gossom, who testified that he resided at Addington, Okla., on May 7, 1924.   Mr. Gossom then detailed the circumstances of the robbery of the bank of $2,991, and described the location of the bank, described the two men that drove up to the bank, and also the road going east toward what is known as Monument Hill.

The state then called Page Bohanan, commonly known as Happy Bohanan, who testified to being one of the parties who took part in the robbery of the bank, and attempted to detail the defendant's connection with the robbery, claiming the defendant had assisted in planning the robbery with the witness and Earnest Hensley; that he had helped move Walter O'Quinn and Lucy Collis in a truck to Duncan and Reuben Lamar came with him; giving in detail defendant's connection with the planning of the robbery and where he was to be when the robbery took place, and where the parties all stayed the night previous to the robbery; admitted his guilt and that he was an

accomplice with Earnest Hensley and Eddie Shoquett, and others. The witness then attempted to identify what is known as State Exhibit A, which seems to be a note addressed by some one to Earnest Hensley. Witness attempted to identify State Exhibit B, which attempted to outline the country in and around Addington and the road out to Monument Hill; states he did not draw the map known as Exhibit B.

The state then called W. J. Ballard, the sheriff, who testified to hearing of the bank robbery on May 7, 1924, and of driving to Addington, and the finding of a Ford coupe which had no license tag on it turned over in a ditch, one glass broken and one puncture; there was no one present at the time, and it was shortly after the bank robbery; that he went out over Monument Hill, which is three miles east of Addington, and described the country between Monument Hill and Addington. He stated State Exhibit B was a fair representation of the country from Addington to Ringling, and that the iron stob indicated on Exhibit B was about ten miles out.

John Montgomery was next called by the state. He admitted he was a convict serving a term in the prison at Granite, Okla., and stated defendant gave him a note, and he delivered it to a black-headed boy known as Earnest: "at the time he gave me the note Earnest Hensley and Happy Bohanan was in jail; they were over here from Granite, and I went back with them; I took the piece of paper Henry gave me along back with me; I gave the paper to Earnest back in the deputy warden's office."

On cross-examination, he stated he rode in the front seat returning to Granite, and Earnest on the rear seat; that he did not have any chance to give him the note until after he returned to Granite; that he did not read the note, and did not know its contents; witness could not testify as to it being the note he delivered to Hensley, but stated it looked like the note in question.

Earnest Hensley was then called to the stand and admitted he was connected with the bank robbery at Addington; that he knew the defendant, and the substance of his statements are the same as to defendant's connection with the robbery of the bank as Happy Bohanan's. Hensley admitted he had been convicted for the part he took in the robbery.

On cross-examination, he admitted he was over to the preliminary of the defendant in this case, and that no note was given him until after they returned to Granite, and that, when the letter was handed to him, he did not read it; that he did read it before the officers got possession of it. Witness further stated he wandered around over the prairie after the bank was robbed on Wednesday until about 3 o'clock Friday; "the roads were not paved out in the country where I was; I think they are paved from Addington to Duncan; I got a hat from an old man out in the country; I did not get anything to eat from him; I thought it would be suspicious to ask for something to eat; I did not see the defendant, Henry Cornett, for several days or weeks after the alleged robbery; when I made the contract and deal to furnish this evidence I thought I had been framed and double-crossed by Walter O'Quinn; I was led to believe in good faith, and did believe that I had been double-crossed, and I was mad then at the defendant; I was pretty sore."

On redirect examination, witness was asked about the contract marked "Exhibit C," as the agreement entered into by them; witness could not be positive that State Exhibit C was the contract made with him; he said it was something like that. The contract identified is as follows:

"4-7-1923          "State Exhibit C.

"To Ben Hughes, witness in the presence of Mr. Justice Ben Hughes, for agreeing to reduce sentence to five years,

which is thirty-two months and twenty days, and will reduce to parole before judgment passed.

"L. S. McGuire,
"State Officer & Investigator."

"Before this statement was drawn, I talked to Mr. Hughes and the party that showed the statement to me and told me to keep a copy of it if I wanted to; I told them it would be no good if their word wasn't any good and to go ahead and keep them; I was speaking to Ben Hughes."

Exhibit C was then read by the Attorney General to the jury.

The following question was propounded by the Attorney General:

"Now, Ernest, I will ask you if you have told the truth as regards to the agreement or any expectation of any. * * *

"Mr. Mathers:   We object to that.

"The Court:   Overruled.

"Mr. Mathers:   We except.

"A. So far as I know, yes, sir.

"Q. Have you colored your memorandum or have you told the facts like you remembered them?   A. Yes, sir.

"Q. Like you remember them?   A. Yes sir."

Continuing, the witness said, "I have served twelve or thirteen months of my sentence; have not received any parole yet." On redirect examination, he stated he did not know who Slim McGuire, Justice, or Ben Hughes was excepting what they told him.

This was all the testimony on behalf of the state relating to the robbing of the bank and those who took part in it. The state next called James Pistole for the purpose of attempting to corroborate the testimony of the accomplices who admitted taking part in the robbery, and the witness, in substance, testified as follows: He lived

at Ringling; he learned of the robbery of the Addington bank; the same day a man and woman came into his restaurant and he had a conversation with them; he did not know who the woman was; they wanted to rent or lease a rooming house, the woman said. At this juncture the prosecution asked the court to require Lucy Collis to be brought into the courtroom, and over the objection of the defendant the court permitted the prosecution to have the witness look over the audience and see if he could identify Lucy Collis, and further in the evidence the prosecution asked that the witness turn away from the audience, and had Lucy Collis take her hat off so she would be in the condition she was when he first saw her. The defendant objected to this, the court overruled his objection, and the witness was permitted to look over the room, and said he recognized the woman. The defendant again interposed an objection, which objection was overruled, and the court permitted the witness to answer, and witness gave the following answer: "That's the lady, as well as I remember she."

Witness, on direct examination, stated that after the robbery the officers came back to his place with Lucy Collis, and, over the objection of the defendant, he was permitted to state that he identified her as being the woman that was there the day of the robbery. Witness was then permitted to identify the defendant in this case, and stated that defendant resembled the man with the woman in the restaurant; "it looks like him." After the witness had been excused from the stand, the question came up as to his positive identification, which had not been made by the witness, and he was recalled and positively identified the defendant as being the man that was in the restaurant at Ringling the day the bank at Addington was reported to have been robbed. Witness admits he had never seen the defendant and the woman before he claims they came to his restaurant to order something to eat; he claims another young man came in about the same time, but he

does not know who he was. Ringling is some distance from Addington, and there is a main traveled road from Duncan to Ringling.

The state further attempted to corroborate the accomplices by calling John Cobb, who claims to have been along the road between Addington and Ringling and to have seen a Ford coupe driving at a rapid rate of speed going from the direction of Addington to Ringling; and he claims he identified Earnest Hensley as being the man that was driving that coupe. He further states that, about five minutes after the Ford coupe that he claims Earnest Hensley was riding in passed, a Ford touring car came along at an ordinary rate of speed, and that the defendant and Lucy Collis were the occupants of this Ford touring car, and that the defendant was driving. Witness had seen neither of these parties before; he was working on a fence and had quit work and had mounted his horse. He undertakes to make a detailed report of both the man and woman in the touring car, and described the car, and how the parties in the car were dressed. The state attempted to show the skill of the witness John Cobb in identifying individuals by showing he had been engaged in the cattle business and had an eye for quick identification of brands; yet there is no contention that either the defendant or the woman riding with him as claimed by the witness Cobb had any special marks displayed for the keen eye of a man schooled in detecting brands. This is probably the first time in the history of jurisprudence where the witness is deemed to be qualified to identify strangers who were driving along the road from his skill in recognizing and identifying brands of cattle.

The state introduced what is designated as Exhibit A, which is as follows: "Mr. Earnest Hensley; Dear sir and friend, well Hapy done all he could to try to blow me up never did think he was that kind off boy well when I get thru telling and proving what I know on him

these people won't think him such angle and his term may not be as short as he thinks in the pen and I see where you done little off that said snitching but they are lots of differance in snitch and lyer so maybe you want me to see iff can dig up something on you may transporting a hore is not gance the law and might find possible something else when look around you will have chance to let me know if it suits you to have me see what can do they are frieds off yours in little trouble I think the boys name is George I think they are girl in with him if you want to know anything about it write to one off them old Jim or Ben H they will see you and tell you about it then you can tell them what you want to do or what you intend to do and will then let me know so will know what to expect tear this up when read it."

State Exhibit A is a piece of paper that was introduced which John Montgomery, a negro convict in the prison at Granite, attempted to identify as being the paper that was given him by the defendant to be delivered to Earnest Hensley. The negro says he never read the paper that the defendant gave him, and the only attempted identification of the defendant's handwriting is a statement of some of the accomplices who claim they had seen the defendant sign his name to checks. When cross-examined, the witness admitted that the wife of the defendant had signed the most of the checks, and that the witness had not seen defendant's handwriting for some time prior to this time.

This is, in substance, all of the testimony offered by the state to attempt to corroborate the testimony of Hensley and Happy Bohanan. Earnest Hensley and Happy Bohanan are admitted bank robbers; and it is admitted they co-operated together in the robbery of the bank at Addington, and, if their statements are to be considered, they are accomplices of the defendant in this case, and, being accomplices, it is necessary for the

state to corroborate their testimony before the jury would be warranted in returning a verdict of guilty against the defendant.

The question then to be determined first in this case, Is the corroborative testimony of such probative effect as to come within the requirement of the statute requiring corroboration of an accomplice?

Defendant has assigned twelve separate errors alleged to have been committed by the trial court. We will first consider the seventh assignment, which is as follows: "Because there was no legal or competent evidence sufficient in law to corroborate the testimony of the two accomplices testifying for the state."

Section 2701, C. O. S. 1921, is as follows: "A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

It is not denied by the state that the witness Hensley and Bohanan robbed the bank of Addington. The state urges that the letter or note described as State Exhibit A is not denied by the defendant, and that the note tends to corroborate the testimony of the bank robbers. The defendant is not required to prove his innocence, nor is he required to contradict any testimony offered by the state that is not deemed of such weight or importance as would tend to connect him with the crime. The witness Hensley figures in several ways in this case. He testifies against the defendant, and details the robbery of the bank, and the arrangement prior to the robbery, and where the defendant and witness were together, and places visited. Yet the state wholly failed to produce any witness that saw Hensley and the defendant together.

The nearest the state came to connecting the defendant with the witness Hensley is found in the testimony of John Cobb, who claims to have seen Hensley driving along the road at a rapid rate of speed, and about five minutes thereafter claims to have seen the defendant and Lucy Collis driving along in a Ford touring car at an ordinary rate of speed. Again we find Hensley getting a contract of immunity from L. S. McGuire, state officer and investigator, and a man by the name of Ben Hughes, or Justice Hughes, wherein it was shown, if he would testify, he would be given five years, and after the trial a parole. At the time Hensley testified in this case, he stated he had served several months of his time and had not received a parole. Later on, and after the defendant had been tried and convicted in this case, and when defendant filed a motion for new trial on the ground of newly discovered evidence, the witness Earnest Hensley made an affidavit on the 27th day of April, 1927. In this affidavit Hensley stated in the trial of Henry Cornett he testified against the said Henry Cornett, and the statements made in his testimony were not true as far as the evidence incriminated or connected Henry Cornett in the robbery of the Addington bank; that prior to the date of the robbery he and Happy Bohanan went to the Del Monte rooms in Duncan, met Guy Wilkinson, Claude Lee, and Eddie Shoquett, where the question of the robbing of the Addington bank was discussed. He states the morning of the robbery they left Duncan about 6 o'clock in two cars—Eddie Shoquett, Happy Bohanan and himself riding in a Ford coupe, Claude Lee and Guy Wilkinson were in a touring car— they left Claude Lee on Monument Hill; he drove the car and remained in the car while Eddie Shoquett and Happy Bohanan robbed the bank; "in driving east from Monument Hill, I had an accident and turned the car over. I then waited for Claude Lee to come with his car and when he did come I got in and rode two miles;

when I left him I laid down in a ditch; Claude was to go on to Ringling and get something to eat and come back that night after it got dark; I left that night and walked to Guy Wilkinson's camp, but as there was no one there I came on into Duncan, where I found Happy Bohanan and Eddie Shoquett; they gave me my part of the money from the robbery; I went to Oklahoma City, and the question of the robbery was discussed with a number of officers, Mr. L. S. McGuire, in the bureau of investigation being one talked with; I was to be a witness against Walter O'Quinn and was to enter a plea of guilty to the charge against me and accept a sentence of five years in prison, which was to be reduced after the trial of O'Quinn to a parole; Luther Bishop came to see me about making a witness against Henry Cornett, and I told him Henry Cornett did not have anything to do with the robbery; he told me if I did not make an agreement to make a witness against Cornett I would have to serve the five years' sentence against me, and in addition to that they would prefer other charges against me, and that is the reason I swore as I did in the trial of the case against Henry Cornett on this charge; the evidence was not true, and was given under a promise and hope of having a lighter sentence if I would do so." Hensley further stated in the affidavit that his statement to the officers that Henry Cornett had nothing to do with the robbery of the Addington bank was true.

The state in its brief argues that the testimony of the witness called by the state to corroborate the two witnesses who admitted they were in the bank robbery is sufficient corroboration, citing Wilson v. State, 24 Okla. Cr. 332, 217 P. 885. A careful examination of the facts in the Wilson Case shows that the testimony of Mary Glover, the daughter of J. D. Glover, was to the effect that the defendant, shortly before the alleged offense occurred, came to their home armed, and ordered them to stop cutting timber, and told the witness that, if her papa

wanted to leave with his family, he had better be leaving. In addition to this, there was evidence showing footprints leading from the scene of the riot to the home of the defendant. This statement of facts connecting the defendant directly with the transaction was such circumstances as tended to show the defendant's connection with the riot of which he was charged.

In Moody v. State, 13 Okla. Cr. 327, 164 P. 676, in the third paragraph of the syllabus, the court said: "It is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstances thereof."

In the Moody Case there was evidence tending to show there had been ill feeling between Moody and W. P. Rausin, who was killed; that the defendant had expressed himself to a witness that he ought to kill the deceased, that the deceased a few days before the killing had put up defendant's mules and charged him $1.50 to get them released. The witness testified that the defendant told him the $1.50 Rausin charged him for the mules was the cause of his death; the tracks led from where the body of Rausin was found toward the home of the defendant, and the shoes of the defendant fitted the larger tracks exactly. Under such circumstances and proof, it tended to corroborate the other witnesses in the case.

In Haas v. State, 37 Okla. Cr. 335, 257 P. 1115, the question of the corroboration of the accomplice was considered by this court fully, and the court in its second

paragraph of the syllabus said: "Where, upon a charge for burglary, a defendant is convicted upon the testimony of accomplices, with independent evidence tending to connect him with the commission of the offense, this court will take the strongest view of the corroboration that the evidence warrants."

However, the testimony shows in the Haas Case that the accomplice was corroborated by witnesses who were running a filling station, where defendant and accomplices stopped and had some work done to the headlights on their car; that, after the burglary, the goods were hid by a bridge, and all parties drove out to get the goods, and two accomplices got out and got them, and defendant and a man by the name of Hood drove away in the car. Later on, witnesses identified the defendant as being the man with Hood who came to their house and telephoned for a service car; the defendant being identified immediately before the robbery and immediately after as being one of the men in company with the accomplices. This testimony was independent of the testimony of the accomplices, which tended to connect the defendant with the burglary and was sufficient to warrant the jury in finding the verdict it did in that case.

In Wever v. State, 22 Okla. Cr. 414, 211 P. 1062, this court cited with approval the case of Kirk v. State, 10 Okla. Cr. 281, 135 P. 1156, in which it was stated: "There cannot be a conviction unless there is proof of substantial facts tending to connect the defendant with the commission of the offense aside from and without the aid of the accomplice testimony."

In order that a conviction may be sustained, it is necessary that the corroborative evidence directly connects the defendant with the commission of the offense. In Jolliffee v. State, 21 Okla. Cr. 278, 207 P. 454, the

court reaffirmed the doctrine that a party cannot be convicted on the uncorroborated testimony of an accomplice, citing Thompson v. State, 9 Okla. Cr. 525, 132 P. 695; Hendrix v. State, 8 Okla. Cr. 530, 129 P. 78, 43 L. R. A. (N. S.) 546.

In Powell v. State, 21 Okla. Cr. 332, 207 P. 570, in discussing the testimony, the court says: "The court is of the opinion that the evidence of both Hart and Cline is that of accomplices, and if this conviction is allowed to stand there must be found in this record evidence independent of those two witnesses which tends to connect the defendant with the commission of the offense. Is there any such evidence? The state asserts that the evidence is sufficient, but nowhere in the brief filed in behalf of the state is there pointed out any evidence tending to corroborate the testimony of the accomplices. We fail to find any which we deem to be sufficient for that purpose. True, there is some evidence which would create a suspicion of the defendant's guilt, but not more, as we view it. The evidence of Mrs. Homer Hart and of W. J. McGuffey, if unexplained, might have that effect, but at most it only tends to prove that some time after the receipt of this stolen car the defendant Powell had then received information that the car was probably a stolen car."

In Livingston v. State, 29 Okla. Cr. 247, 233 P. 235, this court said: "Woods further testified that Sunday night, before the robbery on Monday, they spent the night at Livingston's in a garret room, and that Livingston carried their breakfast to them in this room; that at about 11:30 Sunday night they drove with the defendant and a Mr. Burns from Sayre to a place near the river bridge, where they got a sack of clothes which they had previously hidden there."

In this case, on a hearing upon the motion for con-

tinuance, the record is filled with statements and counter statements as to an agreement that had been entered into with the defendant provided he would give certain testimony; the defendant alleging that he was advised by certain officers not to take his witnesses to court the time the case was assigned for trial, as his case would not be called for trial. This is contradicted by the officers, and defendant's motion for continuance based on that ground was overruled, and defendant forced to go to trial without his witnesses. The defendant in his motion for continuance did not show diligence; no effort being made by him to have his witnesses subpoenaed. He should have had his witnesses subpoenaed or had the agreement that he claims he had with the officers reduced to writing.

A brief summary of the testimony in this case, when stripped of all its unnecessary statements, is this, the bank of Addington was robbed by Eddie Shoquett, Happy Bohanan, and Earnest Hensley; Bohanan and Hensley admitted they took part in the robbery, and testified against the defendant in this case, in which they attempted to say that defendant assisted them in planning the robbery, but did not take part in the robbery; that the defendant was to be out on the road near Monument Hill and was to pick up Hensley in defendant's car after the robbery.

In this case it is necessary to analyze the testimony and arrive at a conclusion as to whether or not there is sufficient testimony positive or circumstantial to connect the defendant with the commission of the crime. The substance of the testimony pointing to the question of corroboration of the accomplices is as follows:

Earnest Hensley, after the defendant was convicted, and when his motion for a new trial was filed on the ground of newly discovered evidence, made the affidavit

which is attached to the motion for a new trial, in which he stated positively that his testimony in the trial of the defendant was false, and was given by him upon a promise of the officers that he would receive immunity; that he would enter a plea and be sentenced to five years, and then after the trial he would secure a parole. It is further shown by Earnest Hensley, who is an admitted bank robber, that he had negotiated with the different officers and figured in several different ways with the officers as to his testimony in this bank robbery. It is true this affidavit of Earnest Hensley may be entitled to but little weight; however, it tends to show the theory of the defendant that in this case the testimony of the defendant was not true. The testimony which the state introduced attempted to corroborate the confessed accomplices, and if true, fails to connect the defendant with the parties any time before the robbery. In other words, the testimony introduced by the state fails to show any connection or association of the defendant with the accomplices just prior to the robbery, or within any reasonable time, or showing where the defendant was with the parties who admit they committed the robbery.

The only testimony the state offered is the testimony of John Cobb, who had never seen the defendant before the day he claims to have seen him driving on the road near where Cobb was fixing fence, and who attempts to identify defendant and Lucy Collis as being the parties he saw going in the direction of Ringling. If it be true that the parties Cobb saw were defendant and Lucy Collis, there is nothing shown that was unusual, as they were driving along a public highway where all parties had a right to drive, in a quiet and peaceful manner, nothing to indicate that they were trying to keep from being seen. Cobb was indefinite in his identification of defendant until after he left the witness stand, and was

recalled and then positively identified the defendant as being the man he claims to have seen driving along the road in company with a woman he says was Lucy Collis.

The witness Pistole, who was running a restaurant at Ringling, several miles away from the scene of the robbery, also testified that the defendant resembled the man that came to his restaurant with a woman and ate something. He also says in his testimony that the woman spoke about renting a rooming house. Not a word of testimony could in any way be interpreted, if it be true, that the defendant and Lucy Collis were the parties that came to his restaurant the day of the robbery, were trying to conceal themselves in any way or that they acted in any suspicious manner. They had a right to be in Ringling and to stop in a restaurant to get something to eat. The fact that they were there would not be a sufficient fact alone to connect them with the robbery of the bank or to show that they aided or abetted in the robbery.

The next effort made by the state was to try to show by the negro convict, who was imprisoned in the Granite prison, that he had received from the defendant a note to be given to a black-headed boy by the name of Earnest. The negro had not read the note, and was not able to identify it except to say it looked like the note he delivered to Earnest Hensley. The note was introduced in evidence, the language of which shows that the writer was either uneducated or probably wrote it to show it was written by an uneducated person. It was attempted to identify the note as being the handwriting of the defendant, by a confessed accomplice, who testified he had seen the defendant sign his name to checks. The circumstances under which the note appeared are very peculiar. If it be true that the defendant wrote the note as the state attempted to show, there is not a word in it referring to this case. It does not tend to show the

defendant had anything to do with the bank robbery, and therefore it is not sufficient to connect the defendant with the robbery or show that he aided or abetted in it.

In Livingston v. State, 29 Okla. Cr. 247, 233 P. 235, this court said in the syllabus: "Where a witness for the state admits that he participated in the robbery of a bank, and implicates the defendant, his testimony is not sufficiently corroborated by merely showing that the defendant was near the scene of the robbery. The corroboration of an accomplice must show more than a commission of the offense. It must show some fact or circumstance implicating the accused in the perpetration of the crime."

In the Livingston Case, supra, the state did show that Livingston was in Sayre, at or about 12 o'clock noon, the day of the robbery, and that he left town alone, passing along a road near a weed and plum thicket at the rear of the bank, this being the extent of the testimony attempting to corroborate the testimony of Woods, who testified that Livingston was connected with the bank robbery. The state in this case asserts that the evidence is sufficient to corroborate the testimony of Hensley and Bohanan, who were admitted accomplices. We fail to find any testimony which we deem sufficient for that purpose. It is true there is some evidence which would tend to create a suspicion of the defendant's guilt, but as we view it it is nothing more than a suspicion.

We hold that, independent of the testimony of the witnesses Hensley and Bohanan, there is not sufficient evidence of a convincing character to show that the defendant had anything to do with this robbery, or that he aided or abetted in it. If it be true that the defendant was along the road and in Ringling at the time the state

attempts to show he was, that would not be sufficient to connect the defendant with the robbery in this case.

There are other errors assigned by the defendant, but the view we take of this record it is not necessary to consider them.

The case is reversed and remanded.

EDWARDS, P. J., and CHAPPELL, J., concur.